No. 74,852

STATE OF KANSAS, *Appellee*, v. MAURICE PIERCE, *Appellant*.

(927 P.2d 929)

 Opinion
filed October 25, 1996. 

*Elizabeth Seale Cateforis*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Maurice Pierce, appeals from his premeditated first-degree murder conviction, raising issues which challenge instructions to the jury and question the sufficiency of evidence. Finding no reversible error, we affirm.

On June 5, 1995, the victim, Devron Bowers, age 14, was participating in Children's Day at his church, the Freeman Avenue Church of God. The celebration was held in the basement of the church and at Zion Hill Park, which was located close to the church in Wyandotte County.

After church services, Bowers and another young member of the church, Keith Harbin, age 16, walked from the church to the park to set up games. When it began to rain, Bowers and Harbin decided to bring balls and other equipment back to the church. Seeing them from his grandmother's home across the street from the park, Excell "Buddy" Gray, age 13, a third young member of the church, joined to help them.

The three boys gathered the equipment into a box and began to walk back to the church. They walked through the alley between Zion Hill Park and the church in order to cut through the church parking lot. The boys intended to enter a side door of the church.

As the boys walked back to the church, the defendant yelled at them from about a quarter of a block away, saying such things as, "[H]ey, you all fools better get up off my block," and "[Y]ou all must think I'm a pussy, a punk." Harbin testified that none of them recognized the defendant. The boys kept walking while the defendant continued to shout at them. When they reached the church door, the defendant flashed a small silver gun at them. Gray, then Harbin, quickly went inside the church. Bowers, however, froze and could not enter the church. As Bowers moved and placed his hand on the church door, Harbin and Gray heard a bang.

From inside the church, Latisha McCracken, age 13, and Joy Primm, age 18, witnessed the defendant hollering at the boys. They saw the defendant flash the gun twice, the second time appearing to shoot towards Bowers. Bowers stepped into the church, holding himself in the chest. He told the people around that he had been shot. Bowers then collapsed and died.

Dr. Erik Mitchell, who performed the autopsy, testified that Bowers suffered a gunshot wound that entered the outside of the right arm and exited the inside of the right arm. Another wound entered in the right side of the body. Bowers had two wounds, but Dr. Mitchell believed that there may have been a single gun shot. Dr. Mitchell also testified that he removed a bullet from under the skin on the left side of the body. He stated that in order to suffer this type of wound, Bowers would have had to be turned away from the gun. In the doctor's opinion, Bowers died as a result of internal bleeding.

After the shot, a witness driving by saw the defendant traveling in a direction away from the church. She testified that he had a gun in his hand. The defendant arrived at the duplex of his sister, Angela Pierce, located up the street from the Freeman Avenue Church of God. Upon entering he flashed a gun at Yolanda Sanders, a friend of Angela Pierce, who was exiting the duplex. Sanders testified that the defendant asked for his sister.

Angela Pierce testified that she was lying in bed when she heard a gunshot. Then she heard sirens. Her roommate and son reported that her brother had arrived and had a gun. She saw the defendant outside the duplex acting suspiciously. When she approached the

defendant, he pointed a small gray gun at her. She began to cry and asked him what he had done; he said that he had shot somebody.

As Angela Pierce returned to her duplex, she noticed the crowd growing outside the Freeman Avenue Church of God. She joined the crowd and discovered that a boy had been shot. She reported to the police that she thought her brother had shot the boy and that he was at her duplex with a gun.

The defendant left his sister's home and went to the neighboring duplex, the home of Juanita Valiant. Valiant noticed the defendant was nervous and kept looking out the window. He told her that some people had tried to rob him and that he had shot one in the leg. He showed her his gun. She testified that he then ran upstairs and hid in her closet. Valiant went out of the house and told the police, who were already coming up the street, where the defendant was hiding.

The officers on the scene at the Freeman Avenue Church of God acted on Angela Pierce's statements and searched her duplex. They went to Valiant's neighboring duplex and were informed that the defendant was upstairs. Officers surrounded the building. The police caught the defendant as he jumped from a window in the back and arrested him.

In their search of Valiant's duplex, the police found a silver semiautomatic pistol hidden between two mattresses in an upstairs bedroom. In addition, the police found a shell casing at the scene of the shooting. These items, along with the bullet recovered at Bowers' autopsy, were sent to the Kansas Bureau of Investigation (KBI) for testing. L.J. Stephenson, a firearms examiner for the KBI, tested the gun and concluded that the recovered bullet and casing were fired from the recovered gun.

The defendant was taken to the police station and was advised of his Miranda rights. He waived his rights and gave a full statement to the police regarding the shooting. He stated that three boys approached him, threatening him. The defendant felt they were coming to hurt him with a knife, so he shot one. After the shooting, he panicked and ran first to his sister's house and then to his friend Rynita's home. The defendant stated that he gave his

gun to Rynita's boyfriend, Laun Cortez. He hid in a closet but after seeing police coming down the street, he jumped out the window.

The defendant contends that the trial court erred by failing to instruct on the lesser included offense of reckless second-degree murder, or "depraved heart murder" at common law, defined in K.S.A. 21-3402(b). Second, he argues that jury instruction No. 4 dilutes his statutory presumption of innocence by using the phrase "claims made by the State" instead of "elements of the offense." The defendant finally claims that the evidence is insufficient to support a conviction of premeditated first-degree murder.

## RECKLESS SECOND-DEGREE MURDER

The defendant was charged with and convicted of premeditated murder in the first degree, K.S.A. 21-3401. The trial court instructed the jury on first-degree murder, K.S.A. 21-3401; intentional second-degree murder, K.S.A. 21-3402(a); voluntary manslaughter, K.S.A. 21-3403; and involuntary manslaughter, K.S.A. 21-3404. No objection to these instructions was made at trial. The defendant argues that the district court failed in its duty to instruct the jury on the lesser included crime of reckless second-degree murder, K.S.A. 21-3402(b).

The defendant correctly asserts that the court has a statutory duty to instruct the jury on lesser included offenses. K.S.A. 21-3107(3) states:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The duty arises whether or not the defendant requests the instruction at trial. *State v. Sanders*, 258 Kan. 409, 413, 904 P.2d 951 (1995); *State v. Bowman*, 252 Kan. 883, 892, 850 P.2d 236 (1993).

A. Reckless second-degree murder as a lesser included offense of premeditated first-degree murder.

Reckless second-degree murder, or "depraved heart murder" at common law, is defined in K.S.A. 21-3402, which states in full:

"Murder in the second degree is the killing of a human being committed:

(a) Intentionally; or

(b) *unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life.*

"Murder in the second degree as described in subsection (a) is a severity level 1, person felony. Murder in the second degree as described in subsection (b) is a severity level 2, person felony." (Emphasis added.)

Subsection (b) was added to the definition of second-degree murder and became effective July 1, 1993. L. 1992, ch. 298, § 4.

Reckless second-degree murder is distinguished from first-degree murder ("intentionally and with premeditation," K.S.A. 21-3401[a]) and intentional second-degree murder by the level of intent required. In his treatise, Professor LaFave explains:

"Extremely negligent conduct, which creates what a reasonable [person] would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute [depraved heart] murder." 2 LaFave, Substantive Criminal Law § 7.4 (1986).

Reckless second-degree murder is similar in nature to involuntary manslaughter, K.S.A. 21-3404(a), which requires a level of recklessness resulting in death.

In determining whether a crime is a lesser included offense of another crime, there is some statutory guidance. K.S.A. 21-3107(2) states in part:

"(2) . . . An included crime may be any of the following:

(a) A lesser degree of the same crime;

(b) an attempt to commit the crime charged;

(c) an attempt to commit a lesser degree of the crime charged; or

(d) a crime necessarily proved if the crime charged were proved."

Under the plain language of subsection (2)(a), the legislature can determine whether a crime is a lesser included crime by defining it as a lesser degree. This subsection is applicable in the present case.

Under K.S.A. 21-3107(2)(a), second-degree murder is a lesser degree of first-degree murder and, therefore, an included crime. It is presumed that the legislature intended depraved heart murder to be a lesser included crime of first-degree murder when the leg-

islature expanded the definition of second-degree murder. "The legislature is presumed to understand the meaning of the words it uses and the procedures it establishes." *State Bank Commissioner v. Emery*, 19 Kan. App. 2d 1063, 1071, 880 P.2d 783 (1994).

This result is consistent with precedent explaining the theory of lesser included crimes of homicide under K.S.A. 21-3107(2)(a). In *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975), the court examined whether manslaughter was a lesser included crime of murder. The *Gregory* court turned to the common law and noted:

> " 'Homicide, of which murder is the highest and most criminal species, is of various degrees, according to circumstances. The term, in its largest sense, is generic, embracing every mode by which the life of one man is taken by the act of another.' " 218 Kan. at 182-83 (quoting *Commonwealth v. Webster*, 59 Mass. 295, 303 [1850]).

The court held that "manslaughter is a lesser degree of homicide than murder, and for purposes of K.S.A. 21-3107(2)(a) is a 'lesser degree of the same crime.' " *Gregory*, 218 Kan. at 183. This holding included involuntary manslaughter, which like depraved heart murder, is predicated on recklessness. In summary, both statutory rules and case law support the conclusion that reckless second-degree murder, or depraved heart murder, is a lesser included crime of first-degree murder.

## B. Duty to instruct on lesser included offense

The duty to instruct arises only where the record shows evidence upon which the accused might reasonably be convicted of the lesser offense. *State v. Coleman*, 253 Kan. 335, 352, 856 P.2d 121 (1993); *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992). In *State v. Harris*, 259 Kan. 689, 702, 915 P.2d 758 (1996), we set forth the evidentiary standard to be followed in determining whether the trial court was required to instruct.

> "We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense."

The defendant did not testify at trial. However, the defendant's nine-page confession was admitted into evidence for the jury's consideration. Several other witnesses testified as to what the defendant did and what the defendant said. We must, therefore, review this evidence in the light most favorable to the defendant's theory and determine whether such evidence, and all evidence at trial, would justify a jury verdict in accord with the defendant's theory. *Harris*, 259 Kan. at 702.

The defendant asserts that several points of evidence support a possible conviction of reckless second-degree murder. He states in his brief that "[w]ielding a gun, flashing it at people, is certainly reckless conduct, and pointing and shooting a gun at another person, clearly manifests indifference towards that person's life."

However, the defendant's statement clearly and consistently seeks to establish that he shot in self-defense. First, the defendant stated that the three boys addressed him with some derogatory comments and he responded in kind. He then pulled out the gun, two of the boys ran, and the third, the victim, was "gonna pull a blade out on me, so you know I thought he was coming to hurt me so I popped him."

Later in the same statement, the defendant stated that the victim "pulled a blade out, and . . . I pulled my gun out first and he pulled a blade out." After the two boys ran, the victim "stood there like I'm a punk. He said man you a punk. So I said man you wouldn't think I wouldn't pull the trigger dude. And he said what's up man, I'm gonna cut you—and popped him." Finally, in his statement the defendant says,

"Yeah, when he pulled his knife out that's when I said, man, what's up, you know clink, clink [the defendant showed how he put a bullet in the chamber of the gun]. You know he pulled his knife out, so I said what's up, I pulled my—and then he stood up with the knife like oh, man you a punk niger [*sic*], you ain't gonna shoot nobody. . . . [H]e pulled his knife out first, then I pulled my gun out. . . . And then I feel that I was gonna get harmed, so I pulled my gun out, and he got shot. I wasn't trying to kill him though man."

Finally, in the last part of his statement the defendant again mentions the knife and states, "I wasn't trying to kill him."

Valiant, in whose duplex defendant hid after the shooting, testified that the defendant told her that some "dudes" up by the church tried to rob him, that they got his money, and that he pulled a gun on them and got his money back and shot one person in the leg.

Consistent with the defendant's testimony and all the evidence at trial, the court instructed on self-defense and involuntary manslaughter, a lawful act (self-defense) done in an unlawful manner. However, other than the two self-serving statements of the defendant that he did not intend to kill the victim, the record contains only tenuous evidence regarding a duty to instruct on reckless second-degree murder.

There is no evidence of recklessness. The defendant's actions were intentional, according to the only evidence admitted, including his own statements. At best the evidence on behalf of the defendant suggested that he did not intend to kill the victim but only defended himself by shooting the victim in the leg. The instructions given by the court, including the involuntary manslaughter instruction, are consistent with the defendant's theory. Under these circumstances, since all evidence supports an intentional shooting, the evidence, when viewed in the light most favorable to the defendant's theory of reckless second-degree murder, would not have justified a jury verdict on this offense. Accordingly, the trial court was under no duty to instruct on this lesser included offense.

## STATUTORY PRESUMPTION OF INNOCENCE IN JURY INSTRUCTION

The defendant challenges jury instruction No. 4 on two grounds. This instruction presents a slight modification of PIK Crim. 3d 52.02. The defendant does not argue that the modification is erroneous, rather he bases his contentions on the language which duplicates PIK Crim. 3d 52.02. Instruction No. 4 provides:

"The State has the burden of proving the defendant is guilty. The defendant is not required to prove he is *not guilty*. You must assume the defendant is not guilty unless the evidence convinces you of the defendant's guilt.

"Your determination must be made in accordance with these instructions, and this is the test you should apply: If you have no reasonable doubt as to the truth of any of the *claims made by the State*, you must find the defendant guilty. If you

have reasonable doubt as to any of the claims made by the State, you must find the defendant not guilty." (Emphasis added.)

The defendant first argues that the use of the words "not guilty" in the first portion of the instruction, rather than a statement that the defendant is presumed "innocent," is clearly erroneous because it dilutes the presumption of innocence guaranteed by statute. K.S.A. 21-3109. Second, he argues that the phrase "claims made by the State" instead of "elements of the offense" is clearly erroneous because it leads to confusion regarding the burden of proof. He asserts that the latter problem is exacerbated when instruction No. 4 is read together with instructions Nos. 5, 7, 8, and 9.

The defendant did not object to the above instruction at trial. No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of the objection unless the instruction is clearly erroneous. K.S.A. 22-3414(3).

An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict. *State v. Deavers*, 252 Kan. 149, 164-65, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

A. The use of the words "not guilty" rather than "presumed innocent" in instruction No. 4.

The defendant contends that the failure to include the presumption of innocence and the use of the terms "guilty" and "not guilty" in the instruction do not accurately convey the law and do not fully convey the fundamental constitutional right to the presumption of innocence. The defendant relies on the analysis of *Flores v. State*, 896 P.2d 558, *reh. denied* 899 P.2d 1162 (Okla. Crim.), *cert. denied* 133 L. Ed. 2d 450 (1995).

In *Flores*, the Oklahoma Court of Criminal Appeals examined the identical issue of whether the terms "not guilty" or "innocent" best preserved a defendant's rights. After discussing the legal importance of the presumption of innocence in criminal trials, the

*Flores* court focused on the effect of the language on the jury. The court stated:

"The presumption of innocence commands the jury to start their deliberations from the premise there exists an absence of guilt while the presumption of not guilty conveys there exists an absence of sufficient proof of guilt. While the distinction is subtle, we find it amounts to an impermissible lessening of the burden of proof by expanding the degree of doubt that is permissible. . . . Instruction No. 2, [using "not guilty" language] conveys to the minds of the jury an erroneous impression, in that it may be construed as varying the rule of law. Further, it imparts a qualification of the meaning, scope, manifest design and operation of the legal presumption of innocence.

"The term presumed innocent has a self-evident meaning comprehensible to the lay juror. The meaning is hardly susceptible to improvement by judicial efforts. Instead of improvement, the most likely outcome of [instruction No. 2] is unnecessary confusion and a constitutionally impermissible lessening of the required standard of proof." *Flores*, 896 P.2d at 562.

The defendant urges this court to accept the reasoning of *Flores* and find PIK Crim. 3d 52.02 invalid.

Under the instruction given by the trial court in this case, the defendant's presumption of innocence is preserved. We have examined the *Flores* argument and adopted an opposing view. In *State v. Keeler*, 238 Kan. 356, 710 P.2d 1279 (1985), we held that "not guilty" was preferable to "innocent" in an instruction to the jury. We found authority persuasive that stated in part:

" 'In ordinary lay usage, the term *not guilty* is often considered to be synonymous with *innocent*. In American criminal jurisprudence, however, they are not totally synonymous. "Not Guilty" is a legal finding by the jury that the prosecution has not met its burden of proof. A "Not Guilty" verdict can result from either of two states of mind on the part of the jury: that they believe the defendant is factually innocent and did not commit the crime; or, although they do not necessarily believe he is innocent, and even "tend" to believe he did not commit the crime, the prosecution's case was not sufficiently strong to convince them of his guilt beyond a reasonable doubt.

" 'Within this second state of mind (reasonable doubt) resulting in a "Not Guilty" verdict lies the distinction between the terms *not guilty* and *innocent*.

" 'Since a "Not Guilty" verdict can be predicated on the "gray zone" of uncertainty somewhere between a belief in innocence and the required proof of guilt, it would be incorrect to state that a conclusion of "Not Guilty" means that the jury believes the defendant is innocent. Although a verdict of "Not Guilty" certainly may be based upon a belief in the defendant's innocence, it just as certainly

may be based on a hesitation in belief of guilty which amounts to a reasonable doubt in the minds of the jury.' " 238 Kan. at 362-63 (quoting Bugliosi, *Not Guilty and Innocent: The Problem Children of Reasonable Doubt*, Vol. 20, No. 2, Court Review 16 [1983]).

We further noted in *Keeler*:

"The Advisory Committee on Criminal Jury Instructions recognized the problem in part and now PIK Crim. 2d 52.02 refers to a determination of 'whether the defendant is guilty or not guilty' rather than the earlier version which directs the jury to 'determine the innocence or guilt of the defendant.' " 238 Kan. at 363.

We concluded that "not guilty" was preferable language to "innocent." 238 Kan. at 364.

More recently, in *State v. Johnson*, 255 Kan. 252, 259, 874 P.2d 623 (1994), the same challenge to PIK Crim. 3d 52.02 arose. In *Johnson*, we found *Keeler* to control the issue and held that the instruction was not clearly erroneous. *Keeler* and *Johnson* control here. We hold that the provisions of PIK Crim. 3d 52.02 accurately reflect the law of this State and properly advise the jury in a criminal case of the burden of proof, the presumption of innocence, and reasonable doubt.

B. The use of the words "claims made by the State" rather than "elements of the crime" in instruction No. 4.

The defendant argues that the use of "claims made by the State" rather than "elements of the crime" allows the jury to make a finding of guilt based on other reasons than whether the prosecution has carried its burden for each element of the crime. He asserts that this instruction violates his due process rights. However, it must be noted that the defendant did not object to this instruction at trial.

The defendant's argument fails to consider the instructions as a whole. The law is well settled that upon review of a challenged jury instruction, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error, although

they may be in some small way erroneous. *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4.

A consideration of the instructions given in this case demonstrates that the instruction complained of properly and fairly states the law as applied to the facts in this case and further demonstrates that the jury could not reasonably have been misled by the instruction. At no time in the trial court's instructions is the phrase "elements of the offense" used. Each time the trial court instructed on charges, it used the language "to establish this charge, each of the following claims must be proved." (Instructions Nos. 5, 7, 8, 9.)

The trial court instructed the jury that "[i]f you have no reasonable doubt as to the truth of any of the *claims* made by the State, you must find the defendant not guilty. If you have reasonable doubt as to any of the *claims* made by the State, you must find the defendant not guilty. Clearly, the "claims made by the State" language refers directly to the "claims" the State must prove beyond a reasonable doubt to convict the defendant. The language used in the trial court's instruction clearly defines the responsibility of the jury. The language used is taken directly from PIK Crim. 3d. We approve of the language used as a clear statement of the burden of the State in criminal trials.

## SUFFICIENCY OF EVIDENCE

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 (1996).

"The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 1, 755 P.2d 551 (1988)." *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994).

The defendant asserts that the record does not sustain the element of premeditation required for a first-degree murder conviction. First-degree murder is defined in K.S.A. 21-3401 as "the killing of a human being committed . . . .[i]ntentionally and with premeditation." The defendant argues that the evidence only

proves that he was trying to intimidate the boys but not that he was intending to commit a deliberate and premeditated murder.

The standard of review for the sufficiency of proof of the element of premeditation is stated in *State v. Sanders*, 258 Kan. 409, 414-15, 904 P.2d 951 (1995):

"We have held that the element of premeditation is not inferred from use of a deadly weapon alone, but if additional circumstances are shown, such as lack of provocation, the defendant's conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless, the evidence may be sufficient to support an inference of premeditation."

In reviewing the record, it is clear that there is sufficient evidence to support an inference of premeditation. The witnesses' testimony unanimously stated that the defendant acted without the least provocation. Despite the defendant's claim that he was confronted with a switchblade, Harbin and Gray testified that they were unarmed. The nature of the wounds entering the arm and side of the chest suggest that Bowers was turning away from the defendant in an evasive action when he was shot. Finally, the defendant hid his gun and attempted to evade the police. Therefore, sufficient evidence supports the element of premeditation for first-degree murder, and the verdict should not be reversed.

Affirmed.