No. 80,962

STATE OF KANSAS *Appellee*, v. LORENZO M. JONES, *Appellant*.

(984 P.2d 132)

Opinion filed July 9, 1999.

*Craig Durham*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Nels P. Noel*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The defendant, Lorenzo Jones, appeals from a jury conviction of one count of second-degree murder in violation of K.S.A. 1998 Supp. 21-3402(a). Jones was sentenced to life imprisonment pursuant to K.S.A. 1996 Supp. 21-4706(c).

Jones claims the district court erred by failing to instruct the jury on reckless second-degree murder as a lesser included offense; in refusing Jones' request to compel two State witnesses to submit to psychological examinations; and in admitting Jones' written statement into evidence.

Jones and Angela Bagby lived together and had a son. In mid-January 1997, Jones was arrested for the battery of Bagby. While Jones was in jail, Bagby several times was seen talking to him by standing outside the fenced area where inmates smoked. On January 30, an officer asked Bagby to leave when it appeared that she and Jones were getting into an argument. A man who was in the jail in January 1997 testified that one time after Bagby visited, Jones remarked and seemed disturbed that she was not wearing her ring. After another visit, Jones seemed agitated. He remarked that she had her ring turned around. Bagby told a close friend that in early

February she had a telephone conversation with Jones in which she told him that she had been "cheating" on him and that she did not want him to come back to her when he was released from jail.

When Jones was released on February 14, 1997, he called Bagby and asked her to pick him up. She refused. At approximately 2:45 p.m. Jones arrived at Bagby's residence. Bagby's friend Tonya Paris was there doing Bagby's nails. Jones entered, greeted Bagby, and talked to his little boy. Paris left for a 3 p.m. tanning appointment. When she returned at 3:30, Bagby whispered to her that Jones had found another man's ID on the dryer. Paris left again shortly after 4 p.m. Paris returned to Bagby's house at approximately 10 p.m. after Bagby called and asked her to come back. Jones, Bagby, and their baby were there. Bagby immediately left the living room and went into the bathroom. Jones told Paris that he and Bagby needed some time alone because he had found out about the man whose ID was on the dryer.

Paris left. At approximately 10:30 she saw Bagby's car being driven toward her house. Paris followed the car. When she got to Bagby's house, the car was parked close to the house and Jones and Bagby were on the porch. Bagby went to the window of Paris' car. She was crying, and she said that Jones would not leave her alone. Jones was acting as if nothing out of the ordinary was happening. At Bagby's request, Paris went in the house with them.

Bagby told Jones to "get his shit packed up, that she was taking him back to Liberal." Without showing any emotion, Jones sat back on the couch and smoked his cigarette. Within a few minutes Paris left. When she left, Bagby's car was still running and the baby was still in it. Within a half hour Paris drove by Bagby's house again. Paris was going to check on her but changed her mind when she saw a car parked nearby that belonged to Bagby's brother, Thad, and Teresa Gill.

Gill testified that they arrived at Bagby's house shortly before 11 p.m. Bagby's car was running, and the baby was in the front seat of the car. When Thad and Gill walked into the house, nobody seemed to be there. Thad called their names and they heard Jones tell them to wait a minute. Then in several minutes he came out of the utility room area. Thad wanted to use the bathroom, and

Jones would not let him. Thad asked about his sister, and Jones said she was gone. Thad pointed out that her purse was still there, and Jones said she was in the bathroom getting high. Jones told them to come back in 20 minutes. When Thad and Gill returned to Bagby's house about 11:30, Jones left with them to go to Liberal to buy crack cocaine.

Bagby's body was found on her bathroom floor by law enforcement officers at approximately 3 p.m. February 15, 1997. Jones told law enforcement officers that he had "snapped" while arguing with Bagby and threw her to the floor, "then she was still."

Bagby died from asphyxia due to manual strangulation. Sufficient hand pressure was applied to her neck to break bone and cartilage in her throat. It is unusual to see breaking of these structures in a victim as young as Bagby, who was 22, because the "structures of the neck are rather pliable" at that age. The autopsy also showed numerous fresh, blunt trauma injuries ranging from Bagby's head to her lower shin. On the bridge of her nose, the nasal bone was exposed by a fresh laceration, which would be consistent with impact on the edge of a countertop or sink. Compression injuries to the area of her mouth and nose were consistent with someone holding a hand over her mouth. The coroner testified that it would take approximately 4 to 6 minutes for the victim to die from manual strangulation. The victim probably would lose consciousness before death occurred.

Jones requested an instruction on reckless second-degree murder. The trial court refused to give it.

Reckless second-degree murder, also known as depraved heart murder, was defined by the legislature as "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 1998 Supp. 21-3402(b).

The version of K.S.A. 21-3107(3) in effect in February 1997, when Bagby was killed, required the trial court to instruct the jury on the crime charged and all lesser included crimes of which the accused might be found guilty. When that provision was in effect, this court said that "[a]n instruction on a lesser included offense is required if there is substantial evidence upon which the defendant

might reasonably have been convicted of the lesser offense." *State v. Shannon*, 258 Kan. 425, 427, 905 P.2d 649 (1995). Substantiality of the evidence was measured by viewing all the evidence in the light most favorable to the defendant. 258 Kan. at 427.

The trial court instructed that Jones was charged with premeditated first-degree murder and, in addition, the jury could consider intentional second-degree murder, voluntary manslaughter, and involuntary manslaughter. The reasons given by the trial judge for declining the proposed instruction on reckless second-degree murder are as follows:

"I did not see the applicability of second degree murder unintentional. And my gut feeling is that unintentional second degree murder is a separate and distinct charge. I believe that the state could have charged first degree murder or, in the alternative, second degree unintentional. But I do not believe that second degree unintentional is a lesser-included crime of second degree intentional."

We have considered several cases in which the evidence would not support a conviction of reckless second-degree murder. *State v. Bailey*, 263 Kan. 685, 952 P.2d 1289 (1998); *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997); and *State v. Pierce*, 260 Kan. 859, 927 P.2d 929 (1996). In each case, the defendant argued that the jury should have been instructed on reckless second-degree murder, and the court disagreed.

In *State v. Pierce*, Pierce was convicted of premeditated first-degree murder. He argued that the jury should have been instructed on reckless second-degree murder. The court concluded that reckless second-degree murder is a lesser included offense of premeditated first-degree murder, 260 Kan. at 865, but that Pierce could not reasonably have been convicted of the lesser offense on the evidence in the record. The evidence showed that Pierce had an encounter with three boys. Pierce stated that he shot one of the boys who had pulled a knife. He intended to shoot the victim but not to kill him. The court stated: "There is no evidence of recklessness. The defendant's actions were intentional . . . . At best the evidence on behalf of the defendant suggested that he did not intend to kill the victim but only defended himself by [intentionally] shooting the victim in the leg." 260 Kan. at 867.

In *State v. Clark*, Clark was convicted of premeditated first-degree murder of his girlfriend, Odanga, and attempted premeditated first-degree murder of a friend, Shine. He argued that the jury should have been instructed on reckless second-degree murder and attempted reckless second-degree murder. The court concluded otherwise. After a tumultuous evening at a bar, Clark and Odanga were fighting in their apartment. When friends arrived, Odanga held her face and screamed that Clark had hit her and Shine began to fight with Clark. Clark got a gun from the bedroom and fired two shots in Shine's direction. Then he went over to Odanga. She bent down with her hands up by her face. Clark put the muzzle of the gun to her temple and fired. With regard to Clark's killing his girlfriend, the court stated that "[t]he only evidence . . . of an accidental shooting was the statement Clark made after arrival of the law enforcement officers that he did not intend to kill [Odanga]. Clark's self-serving statement alone does not support a finding of recklessness." 261 Kan. at 466. With regard to Clark's firing at Shine, the court stated that there was no evidence that Shine's confronting Clark was "sufficient to cause Clark to believe he was in danger of great bodily harm or to deprive him of self-control." 261 Kan. at 467-68.

In *State v. Bailey*, Bailey was charged with premeditated first-degree murder and was convicted of intentional second-degree murder of Dunigan. During the days preceding the shooting, several people heard Bailey and Dunigan fighting and Bailey threatening to kill Dunigan. Bailey testified that there was an argument about cigarettes with several people present in his living room. Someone shouted from the kitchen that they could "trash" Bailey. He reached under the couch for his gun and shot Dunigan, who was sitting nearby in a chair. Bailey argued that the jury should have been instructed on reckless second-degree murder on the theory that his intentional shooting was done without regard to the consequences and, therefore, was reckless. The court disagreed: "We find *Pierce* controlling in the present case. Bailey cites *Pierce* but ignores its clear message—a defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than

reckless even if the defendant did not intend to kill the victim." 263 Kan. at 691.

In *State v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997), we reviewed the defendant's conviction of reckless second-degree murder. Robinson killed Richard Crowley, who was the initial aggressor, by hitting him in the head with a golf club. Crowley, angry about his sons being threatened by some boys, armed himself with a baseball bat, chased the boys, and swung the bat at them. The boys grabbed golf clubs out of someone's conveniently located bag and turned the tables on Crowley, who began to use the bat defensively. When one of the boys fell, Crowley hit him with the bat. The other boys closed in on Crowley, and Robinson hit Crowley in the head, killing him.

"Robinson testified that he was not trying to hit Crowley in the head, but was trying to hit Crowley in the arms in order to make him stop hitting [the fallen boy] with the bat. Robinson testified that he could not remember if his eyes were open or shut when he hit Crowley." 261 Kan. at 868-69.

This court rejected Robinson's challenge to the constitutionality of K.S.A. 21-3402(b) and concluded that a rational factfinder could have found him guilty of reckless second-degree murder. 261 Kan. at 878, 882.

The court rejected the argument that the defendant's extreme indifference must be for human life in general rather than for one person's well-being. Robinson also argued that only involuntary manslaughter, not reckless second-degree murder, can apply when excessive force is used in self-defense or defense of others. The court concluded that the jury had not found such an imperfect defense-of-others situation:

"Robinson struck Crowley in the head with the golf club, even though his friend, whom Crowley had struck with a bat, was getting up off of the ground and was no longer in danger. While Robinson testified that he did not aim at any particular part of Crowley's body, the State called a medical expert to the stand who testified that the golf club hit Crowley's head with direct force and was not deflected off any other part of Crowley's body. The jury could have inferred from this testimony that Robinson intentionally aimed for Crowley's head. Even if the jury did not find such intent, the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness 'manifesting an extreme indifference to the value of human life.' " 261 Kan. at 881.

In the present case, Jones would justify an instruction on reckless second-degree murder on his lack of intent to kill Bagby. He does not claim to have acted in self-defense; he just "snapped." As noted above, we rejected the same argument in *Pierce, Clark,* and *Bailey*. When the evidence in this case is viewed in the light most favorable to defendant, as it must be on a question of instructing on lesser included offenses, it does not support an instruction on reckless second-degree murder. Jones told police that he killed Bagby when he threw her to the floor. His statement, however, cannot be reconciled with the autopsy results and the coroner's conclusion that her death was the result of manual strangulation, which took 4 to 6 minutes. Jones' self-serving statement is the only evidence that would tend to support an instruction on reckless second-degree murder. In light of all the other evidence, in particular the objective findings of the pathologist, defendant's statement is insubstantial and insufficient to support a theory of unintentional killing. See *State v. Dixon*, 248 Kan. 776, 786-87, 811 P.2d 1153 (1991). All the other evidence excludes a theory of reckless second-degree murder. Bagby died when Jones used his hands to grip her neck hard enough to break pliable bone and cartilage structures and long enough—4 to 6 minutes—to fatally deprive her of oxygen. His actions were intentional and not reckless. Jones' self-serving statement does not support a reckless second-degree murder instruction. His conduct is indistinguishable from a defendant's action in pointing a gun at a victim and pulling the trigger, which is intentional rather than reckless conduct. See, *e. g., Bailey*, 263 Kan. at 691. In *State v. Rupe*, 226 Kan. 474, 477-78, 601 P.2d 675 (1979), where defendant argued that his use of hands was "insufficient to prove an intent to kill," the court referred to strangulation as "a most effective means of killing."

Jones further injects his voluntary intoxication defense into this picture by arguing that, despite the autopsy showing, an instruction on reckless second-degree murder was justified because he was incapable of forming the intent to kill Bagby due to his impaired state. A clinical psychologist, Marc Quillen, testified on the defendant's behalf about the behavioral effects of alcohol and cocaine use. Jones told a KBI agent that he and Bagby drank "about two

cases of beer" and "smoked a couple rocks of crack [cocaine]" after he arrived home at approximately 4:30 p.m. on February 14. Based on Jones' report to the KBI agent about the alcohol and cocaine he had consumed and on Jones' statement to police about how he killed Bagby, Quillen was of the opinion "that at the time of [Bagby's] death, Mr. Jones's judgment was impaired, his ability to rationally think through the consequences of his behavior was impaired, and his ability to be able to understand specifically what he was doing, to intend the act, was impaired."

What Jones' argument does not take into account is that an intoxicated defendant's being incapable of forming the intent to kill does not transform his or her conduct into conduct so reckless in the circumstances as to manifest extreme indifference to the value of human life. In other words, intoxication can eliminate intent to kill so that the killing is unintentional under the law, but it may not supply the extreme recklessness element of unintentional second-degree murder. Thus, evidence of voluntary intoxication alone will not justify an instruction on reckless second-degree murder as a lesser offense of premeditated first-degree murder.

The district court incorrectly believed that depraved heart murder belonged in a completely separate category and was not a lesser included offense of first-degree murder or intentional second-degree murder. A trial court's reasoning, though, is immaterial if the ruling is correct for any reason. *Stone v. City of Kiowa*, 263 Kan. 502, 516, 950 P.2d 1305 (1997). Here, the district court was correct in refusing to give the reckless second-degree murder instruction, albeit for the wrong reason.

We next consider whether the district court erred in refusing Jones' request to compel two State witnesses to submit to psychological examinations. Jones filed a pretrial motion requesting psychological and mental evaluations of Ron Schebaum and Carlos Carillo "for the purpose of preparing his cross-examination of them." At the preliminary hearing, Schebaum testified that he was in the Haskell County Jail for a probation violation on his third DUI offense. He observed interactions between Bagby and Jones. Also at the preliminary hearing, Carillo testified that he was in the

Haskell County Jail for his fourth DUI offense. He, too, observed Bagby's visits to Jones.

The trial judge denied Jones' motion, noting that the Kansas cases he was aware of on compelled evaluations of witnesses involved sex crimes and complaining witnesses and that he knew of no Kansas case in which a court has ordered evaluation. Schebaum testified at trial, and the State read the preliminary hearing testimony of Carillo.

On appeal, Jones wants to boost this issue to constitutional magnitude. He frames it as a Confrontation Clause matter, and he relies on cases from other jurisdictions. He did not cite a single case, however, in which mental evaluation of a prosecution witness was allowed. In most of the cases relied on by Jones, evaluation of the complaining witness was sought. *U.S. v. Pino*, 827 F.2d 1429 (10th Cir. 1987); *State v. Elvin*, 481 N.W.2d 571 (Minn. App. 1992); *State v. Frost*, 141 N.H. 493, 686 A.2d 1172 (1996); *State v. Stearns*, 130 N.H. 475, 547 A.2d 672 (1988); and *Com. v. Douglass*, 403 Pa. Super. 105, 588 A.2d 53 (1991). In two of the cases Jones cited, the defendant sought evaluation of nonvictim government witnesses. In *Latham v. State*, 790 P.2d 717 (Alaska App. 1990), the target was an informant. In *State v. Morant*, 242 Conn. 666, 701 A.2d 1 (1997), the court considered whether the trial court should have permitted evaluation of an accomplice. In affirming the trial court's refusal, the appellate court stated: "Our case law demonstrates that the 'drastic measure' of ordering a psychiatric examination . . . should be taken only upon 'compelling reasons.'" 242 Conn. at 679.

The trial judge's remarks about Kansas case law were not far off the mark. In *State v. Gregg*, 226 Kan. 481, 602 P.2d 85 (1979), defendant was convicted of aggravated sodomy and aggravated indecent solicitation of a child. Defendant's request for a psychiatric examination of the victim, an 8-year-old girl, was denied by the trial judge. Stating that "[t]he matter of ordering a psychiatric examination of the complaining witness in a sex crime case is an issue of first impression in Kansas" and finding no statutory authorization, the court reviewed decisions from other states. 226 Kan. at 485. The rules in other jurisdictions ranged from a sex crime de-

fendant having an absolute right to an order compelling evaluation to the trial court having no inherent power to compel evaluation. The middle ground was chosen by this court: "We . . . hold a trial judge has the discretion to order a psychiatric examination of the complaining witness in a sex crime case if the defendant presents a compelling reason for such examination." 226 Kan. at 489. The court found that the trial court had not abused its discretion in refusing to order Gregg's victim to submit to a psychiatric examination. 226 Kan. at 490. There are two other sex crime cases in Kansas in which the trial court refused to order examinations and this court found no abuse of discretion: *State v. Brown*, 249 Kan. 698, 709-11, 823 P.2d 190 (1991); *State v. Wooldridge*, 237 Kan. 737, 739, 703 P.2d 1375 (1985).

*State v. Hicks*, 240 Kan. 302, 729 P.2d 1146 (1986), the other Kansas case cited by Jones, involved an aggravated burglary rather than a sex crime. The victim, more than 20 years earlier in an unrelated matter, had been found incompetent to stand trial after being charged with one or more felonies. After trial had begun for Hicks and codefendant Collins, their counsel orally requested an order compelling the victim to submit to a psychiatric evaluation.

"[T]he trial court refused to interrupt the trial and secure an examination of the witness, finding no reason in the evidence to do so. After the trial, and before ruling on the motion for new trial, it did order an examination and the results thereof were not helpful to the defendants. We find no abuse of discretion in refusing to grant the motion for examination made during trial. In light of the results of the post-trial examination, the issue is moot." 240 Kan. at 308.

No case has been brought to the court's attention in which the court actually discussed whether the *Gregg* rule should be extended to cases not involving sex crimes. Nor has any Kansas case been brought to the court's attention involving a request for evaluation of a noncomplaining witness. Jones urges the court to extend the rule, if it has not already done so. He contends that the rationale is the same—a psychological evaluation is needed of any government witness who might fabricate testimony due to mental impairment.

Jones suggests that the alcohol abuse of Schebaum and Carillo may have impaired their ability to recall events. Examination of

their testimony does not reveal support for his suggestion. Their testimony is marked by fairly detailed recollections rather than memory lapses. Moreover, examination of the aspects of their testimony that Jones singles out does not reveal support for his position. Thus, even if the rule were extended as Jones contends, he has not presented any compelling reasons why the trial court should have ordered Schebaum and Carillo to undergo evaluations. The district court did not err in denying Jones' request that the witnesses be evaluated.

Jones next asserts that law enforcement officers coerced him into giving his statement by implying that he might receive leniency in exchange. He argues that the State's use of his involuntary statement at trial violates due process and requires reversal of his conviction.

The State argues that the question of the voluntariness of Jones' statement was not preserved for appeal because defense counsel did not object to its admission into evidence. Defendant's pretrial motion to suppress the statement was denied. When a pretrial motion to suppress has been denied, the moving party must object to introduction of the evidence at trial in order to preserve the issue for appeal. *State v. Cellier*, 263 Kan. 54, Syl. ¶ 2, 948 P.2d 616 (1997). Defense counsel in the present case did not object when the evidence was introduced during trial.

Defense counsel, however, just before the jurors were sworn asked the trial judge to reconsider his rulings on defendant's pretrial motions. Jones contends that defense counsel's action satisfied the statutory requirement. K.S.A. 60-404 provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Thus, Jones would equate defense counsel's renewing pretrial motions at the beginning of trial with a timely interposed objection.

We rejected this precise argument in *State v. Nunn*, 244 Kan. 207, 213, 768 P.2d 268 (1989), giving the following explanation why nothing short of an objection at the time evidence is offered satisfied the requirement:

"In the instant case the earlier events involving L.H. and N.H. were remarkably similar to the events testified to by the four young victims here. The appellant did not deny that the four girls may have been molested; he merely contended that he did not have anything to do with it. He also presented evidence that other men were at the house when some of the events allegedly took place and evidently implied that, if anything was done to the girls, it must have been someone else who did the acts to which the girls testified. In closing argument, defense counsel again alluded to the possibility that someone else may have committed the acts if they actually occurred.

"It should also be noted that this issue first came up at a motion in limine heard by Judge Watson over a week prior to trial. At the beginning of the trial, Judge Kennedy again heard arguments on the admissibility of the prior crimes evidence. On neither occasion did the court actually know what the defense strategy would be or whether intent and/or identity would be an issue. In *Douglas v. Lombardino*, 236 Kan. 471, Syl. ¶ 2, 693 P.2d 1138 (1985), we held: 'When a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal.'

"One of the reasons for the rule requiring an objection to the evidence during trial is clearly illustrated by this case. The judge at the hearing on the motion in limine, and again at the motion immediately preceding trial, had no way of knowing what the defense would be or whether intent and identity would be issues. The materiality of the proposed evidence may not become actually apparent until other evidence has been admitted. Here, the testimony of L.H. and N.H. was not presented until after the four young victims had testified. The court was then in a position to determine the similarity of the prior crimes and their relevance to the present case. Before Judge Watson, the entire argument was based upon the prejudicial nature of the proposed testimony.

"The record does not disclose any objection during trial to the testimony of L.H. and N.H. The court instructed the jury regarding the limited purpose of the evidence just prior to the testimony and again in the written instructions at the close of the trial. Based upon the record in this case, we do not find an abuse of discretion in admitting the testimony of L.H. and N.H. for the limited purpose of identity."

Although the facts in *Nunn* may be distinguished from those in the present case, we conclude it is controlling and defense counsel did not properly preserve the issue for appeal. Notwithstanding such failure, Jones contends there are exceptional circumstances present that empower the court to consider it. He relies on *State v. Puckett*, 230 Kan. 596, 640 P.2d 1198 (1982), for the proposition that an "unpreserved" issue may be considered by the appellate court in certain circumstances. In fact, the question in *Puckett* was

whether an issue not raised in the trial court could be considered on appeal. The court stated the following principle:

"Although ordinarily an appellate court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal, the court does have the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights." 230 Kan. 596, Syl. ¶ 1.

We do not agree with Jones' contention. The voluntariness of his statement is a question of law based on proven facts, but it seems unlikely that it would be finally determinative of the case. Without the statement, there is substantial competent evidence that supports the conviction. In addition, Jones relied on his statement to the officer as the basis for his contention that the jury should have been instructed on reckless second-degree murder. Even if we concluded that exceptional circumstances existed, Jones' argument has no merit. He was interrogated on several occasions. The police conduct that he claims caused him to give his involuntary statement occurred about the time that a break was taken and the tape recorder temporarily turned off. At the suppression hearing, Jones testified that Agent Sill left the room and then Officer Fritzen shut off the recorder. According to Jones, Fritzen

"told me that if I was to admit to this and to—and something else—I can't remember—but it was along the same lines as if I was to admit to this, then he would see to it that I be charged with involuntary manslaughter as opposed to first degree murder."

However, according to Fritzen, Jones turned off the recorder and said that he would tell what had happened if Fritzen would get him a pack of cigarettes. Fritzen got him the cigarettes, and Jones "began to narrate what had happened." Fritzen testified that Jones told them essentially the same story as the one in his written statement. Fritzen asked Jones to write out his statement. Jones did so. When asked the direct question whether he had promised Jones that he would be charged with involuntary manslaughter for giving his statement, Fritzen denied having done so.

*State v. Baston*, 261 Kan. 100, 928 P.2d 79 (1996), was a State's appeal from the trial court's suppression of the defendant's state-

ment made upon promises of leniency. The court applied the following principles:

"In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence."

"Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused."

"In considering the effect of a promise made by the police to an accused during an interrogation, various factors have been recognized as worthy of consideration in determining the voluntariness of a subsequent confession. To render such a confession involuntary, it is generally held that the promise must concern action to be taken by a public official, that the promised action must be such as would likely cause the accused to make a false statement to obtain the benefits of the promise, and the promise must be made by a person whom the accused reasonably believes to have the power or authority to execute the same." 261 Kan. 100, Syl. ¶¶ 3, 4, and 5.

In the present case, the trial judge simply did not believe the defendant's assertion that Fritzen promised to see that he was charged with involuntary manslaughter if he admitted killing Bagby. Fritzen's account of what took place while the tape recorder was turned off constitutes substantial competent evidence supporting the trial court's conclusion. There was no error in the admission of Jones' statement.

The judgment of the district court is affirmed.