(206 P.3d 529)
Nos. 98,292
98,952

STATE OF KANSAS, *Appellee,* v. DANA WAYNE DEAL, *Appellant.*

Petition for review granted March 8, 2010.

Opinion filed May 1, 2009.

*Lydia Krebs,* of Kansas Appellate Defender Office, for appellant.

*James R. Spring,* deputy county attorney, *Christopher E. Smith,* county attorney, and *Stephen N. Six,* attorney general, for appellee.

Before GREENE, P.J., GREEN and LEBEN, JJ.

GREEN, J.: Dana Wayne Deal appeals from his jury trial conviction and sentence for one count of second-degree murder in violation of K.S.A. 21-3402(b). Deal first argues that there was insufficient evidence to convict him of unintentional second-degree murder. During the oral arguments made by the parties before this court, the sufficiency of the evidence issue raised an ancillary question: If this court finds that the State failed to present sufficient evidence to sustain a conviction for unintentional second-degree murder but finds sufficient evidence in the record to support a conviction for voluntary manslaughter, could this court remand for resentencing on voluntary manslaughter? We asked both parties to address this question. Both Deal and the State concluded in their letters, under Supreme Court Rule 6.09(b) (2008 Kan. Ct. R. Annot. 47), that if we found insufficient evidence for the jury to convict Deal of unintentional second-degree murder, we could remand to the trial court for resentencing on the lesser included offense of voluntary manslaughter.

The State, however, still maintained in its letter of additional authority that there was sufficient evidence for a jury to conclude that Deal's actions were reckless and to convict him of unintentional second-degree murder. We agree with the State. The evidence in this case established that Deal killed the victim while beating him with a tire tool with the intent to severely injure him. When reviewing all of the evidence in the light most favorable to the State, we are convinced that the jury could have found beyond a reasonable doubt that Deal recklessly killed the victim under circumstances manifesting extreme indifference to the value of human life. As a result, there was sufficient evidence to convict Deal of unintentional second-degree murder under K.S.A. 21-3402(b). Because we have determined, based on the foregoing analysis, that there was sufficient evidence for the jury to convict Deal of unintentional second-degree murder, we need not further address the arguments made by Deal and the State in their letters of additional authority.

In addition, Deals asserts the following arguments on appeal: that the trial court erred in instructing the jury on "no duty to retreat"; that the trial court erred in admitting prior crimes evidence; that the trial court erred in denying him a continuance on his motions for a new trial; that the trial court violated his constitutional rights by sentencing him to the aggravated sentence in the applicable sentencing grid box; and that the trial court violated his constitutional rights in using his criminal history to increase his sentence. Finding no reversible error, we affirm.

Deal's conviction in this case was based on events that occurred on the night of July 8, 2005, and the early morning of July 9, 2005. A little after 11 p.m. on July 8, 2005, Ric Montoya knocked on Karla Halstead's door and asked if Donnie Irving was there. Halstead explained to Montoya that Irving did not live there. Irving actually lived next door to Halstead. Nevertheless, Halstead noticed that Montoya was intoxicated and was unable to understand what she was telling him. Halstead eventually closed the door and left Montoya standing on her front porch.

Around midnight, Halstead looked out of her kitchen window and saw Montoya and another man wearing dark clothes coming

out of the side door of Irving's house. Although Halstead knew Montoya, she did not recognize the other man. Halstead saw the unidentified man walk across the street and throw an object over a 10- to 12-foot dike on the north side of the street. Halstead then saw the unidentified man and Montoya get into a white pickup truck and drive away with the headlights off.

At around 12:43 a.m., a woman called the police and stated that she had just been inside Irving's house and had seen him on the floor. When Officer Gary Bortz arrived at Irving's house, the side door was open. Bortz went inside and saw Irving lying on the floor. Irving was unresponsive, and it appeared that he had lost a large amount of blood. When emergency medical services personnel arrived, they declared Irving to be in very critical condition and transported him to the hospital. Irving was later declared dead.

Officer Kurt Weber, who was helping with the investigation of Irving's homicide, learned that Montoya had been with Deal around the time the incident occurred. When an officer later contacted Deal, Deal agreed to come into the police station to talk with police. Weber and another officer interviewed Deal on the afternoon of July 9, 2005. During the first part of his interview, Deal denied being at Irving's house on the night in question. Nevertheless, after a break in the interview, the officers confronted Deal with the fact that his truck had been seen at Irving's house, that a neighbor had identified Montoya, and that they knew he had been with Montoya that night. Deal then admitted that he had been at Irving's house with Montoya.

Deal told the officers that while he and Montoya were driving around on the night of July 8, 2005, Montoya told him about an incident that occurred between Deal's girlfriend, Michelle Morris, and Irving. Morris had alleged that Irving had kept her at his residence for 3 days during which time Irving had drugged her and had sexually abused her. Deal said that he wanted to get Irving's side of the story, and he and Montoya drove to Irving's house. In his written statement, however, Deal wrote that Montoya had said, "[L]et's go over there and tell him to cool his shit."

According to Deal, Montoya was drunk and initially went to the wrong house. Deal knocked on Irving's door. When Irving an-

swered the door, Deal confronted Irving about the alleged incident with Morris. Deal and Irving argued, and Irving told Deal to "get the fuck out" of his house. Deal told the officers that at that point, Irving picked up a tire tool, which was a metal bar, and swung it at him twice. According to Deal, he was able to block the blows with his arms. Deal pointed to the area on his arms where he blocked Irving's blows, but Weber did not see any injuries, scrapes, or red marks.

Deal told the officers that he kicked Irving in the groin and was able to get the tire tool away from Irving. Deal stated that he struck Irving twice with the tire tool: once in the head and once in the left shoulder area. In his written statement, however, Deal indicated that he struck Irving once in the front right area of his head and another time in his right head and neck area. During his interview, Deal further stated that when Irving fell to the floor, he kicked him "in the ass." According to Deal, Montoya came into the room while he was kicking Irving. Deal stated that Montoya "poked and sliced" at Irving with a fillet knife that belonged to Deal. Deal normally kept the fillet knife above the sun visor in his truck, and Montoya had the knife when he came into Irving's house. Montoya also kicked Irving several times.

Deal told the officers that when he and Montoya tried to leave Irving's house, the front door would not open. Montoya then kicked open the side door, and he and Deal left Irving's house. According to Deal, Montoya handed him the knife he had used on Irving. Deal threw the knife and tire tool over the dike to the north of Irving's house. Deal admitted that when he and Montoya drove away from Irving's house, he did not turn on his headlights until he got down the street.

Deal told the officers that he knew that Irving was hurt but that he did not mean to kill him. Deal stated that no matter what Irving had done, Irving did not deserve to die. A tire tool, which was a bar approximately 18 to 20 inches long, and a fillet knife were later found on the north side of the dike near Irving's house. In addition, officers found a variety of tools, including tire-changing and jack equipment, in Deal's truck.

On July 10, 2005, Deal agreed to do a "walk-through" interview at Irving's house. Once during the interview, Deal referred to the metal bar used during the incident as "my bar." Deal told the officers that his emotions got out of hand when Irving showed disrespect towards his girlfriend. Deal stated that he was not thinking during the incident, that he felt he was defending himself when he hit Irving the first time, and that he struck out of anger when he hit Irving the second time. Deal told the officers that he knew that Irving carried knives and guns and that he believed that Irving might have kept a gun or knife in the corner of the room. During the "walk-through" interview, one of the officers noticed a small red mark on Deal's forearm. Deal flinched when the officer touched it.

Deal was again interviewed on July 11, 2005, at the sheriff's department. During that interview, Deal mentioned that Irving had shown him a squirt gun. On February 15, 2006, a videotaped deposition was taken of Deal. During the deposition, Deal went into great detail about a .38 caliber gun that Irving possessed. Moreover, Deal described a modified paintball gun that Irving owned that shot out steel bullets. This was the first time that Deal had mentioned the .38 caliber gun or the modified paintball gun.

Dr. Lawrence Czarnecki conducted the autopsy on Irving's body. Czarnecki testified that Irving had blunt force injuries to the right and left side of his head; to his chest, abdomen, and shoulder area; and to his legs. According to Czarnecki, Irving sustained a depressed fracture to his head and Irving's skull had been pushed into his brain. Czarnecki noted that Irving had bleeding on the brain surface and within the brain tissue. Czarnecki further testified that Irving sustained four rib fractures and breaks in each forearm. According to Czarnecki, Irving also had lacerations, abrasions, and contusions on his arms, hands, and legs. Czarnecki testified that Irving had a 3/8-inch incision on his right leg but that this injury was not enough to kill Irving. Czarnecki determined that the cause of Irving's death was multiple blunt and sharp force injuries. Nevertheless, Czarnecki testified that Irving's blunt force injuries to his head were enough to kill him.

Deal was initially charged with first-degree premeditated murder in violation of K.S.A. 21-3401(a) or, alternatively, first-degree felony murder in violation of K.S.A. 21-3401(b). Before the conclusion of the preliminary hearing, Deal entered into an agreement with the State to reduce the charge to second-degree "unintentional but reckless" murder in violation of K.S.A. 21-3402(b). Under the agreement, Deal would be allowed to take that charge to trial in exchange for his testimony against Montoya. The trial court instructed the jury on voluntary manslaughter and involuntary manslaughter. The jury ultimately convicted Deal of the second-degree murder charge. Deal was sentenced to 168 months in prison, which represented the aggravated number in the appropriate sentencing grid box.

*Sufficiency of the Evidence*

First, Deal argues that the State failed to present sufficient evidence to convict him of unintentional second-degree murder under K.S.A. 21-3402(b) because there was no evidence that he acted unintentionally but recklessly. When a defendant challenges the sufficiency of the evidence in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Gutierrez*, 285 Kan. 332, 336, 172 P.3d 18 (2007).

In distinguishing unintentional second-degree murder, or depraved heart second-degree murder, from involuntary manslaughter, our Supreme Court has stated:

"Depraved heart second-degree murder *requires a conscious disregard of the risk, sufficient under the circumstances, to manifest extreme indifference to the value of human life*. Recklessness that can be assimilated to purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter. *Conviction of depraved heart second-degree murder requires proof that the defendant acted recklessly under circumstances manifesting extreme indifference to the value of human life*. This language describes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter." (Emphasis added.) *State v. Robinson*, 261 Kan. 865, Syl. ¶ 5, 934 P.2d 38 (1997).

Deal contends that all of the evidence presented by the State showed that he had acted intentionally, and not recklessly, in beating Irving. Deal maintains that because neither the State nor the defense presented any evidence that he acted recklessly, this court must vacate his conviction.

Deal relies on several cases where our Supreme Court has held that the evidence did not warrant a lesser included offense instruction on depraved heart second-degree murder. See *State v. Cavaness*, 278 Kan. 469, 101 P.3d 717 (2004); *State v. Jones*, 267 Kan. 627, 984 P.2d 132 (1999); *State v. Bailey*, 263 Kan. 685, 952 P.2d 1289 (1998), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006); *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997); *State v. Pierce*, 260 Kan. 859, 927 P.2d 929 (1996).

In attempting to analogize those cases to his case, Deal makes the following conditional argument:

"If the evidence in this case, which is factually indistinguishable from the situations in *Cavaness*, *Jones*, *Bailey*, *Clark*, and *Pierce*, would be insufficient to warrant an instruction on unintentional second degree murder, then it would be disingenuous to find that the evidence is sufficient to support a conviction for that same crime."

Deal then argues as follows:

"If this Court would have upheld the denial of Mr. Deal's hypothetical request for a lesser included offense instruction because no reasonable jury could find him guilty of unintentional second degree murder based on the evidence presented at trial, then it would be incorrect to allow a conviction for that crime in the present case."

Were the cited cases similar to the present case, we might find some merit in Deal's argument. The five cases relied upon do not, however, persuade us that Deal's contention is correct.

For instance, the cases of *Pierce*, *Bailey*, and *Clark* all involved a person intentionally firing a gun at another individual. Deal ignores what the *Bailey* court held concerning situations where one person points and fires a gun at another: "We find *Pierce* controlling in the present case. Bailey cites *Pierce* but ignores its clear message—a defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the

defendant did not intend to kill the victim." 263 Kan. at 691. Here, Deal did not use a gun during the altercation.

Next, *Jones* involved a manual strangulation which would have required the defendant to apply at least 4 to 6 minutes of continued pressure to the victim's throat in order to kill her. In determining that the defendant's conduct of strangling the victim to death was comparable to a defendant's actions in pointing a gun at a victim and pulling the trigger, our Supreme Court in *Jones* stated:

"All the other evidence excludes a theory of reckless second-degree murder. Bagby died when Jones used his hands to grip her neck hard enough to break pliable bone and cartilage structures and long enough—4 to 6 minutes—to fatally deprive her of oxygen. His actions were intentional and not reckless. Jones' self-serving statement dos not support a reckless second-degree murder instruction. *His conduct is indistinguishable from a defendant's action in pointing a gun at a victim and pulling the trigger, which is intentional rather than reckless conduct.* [Citation omitted.]" (Emphasis added.) 267 Kan. at 633.

Finally, *Cavaness* involved a prolonged beating and torture of the victim with the defendant participating in a discussion that they could not let the victim leave for fear of retaliation. At some point during the beating, the group decided that the victim needed to be killed. Quite different from *Cavaness*, the evidence here failed to show a similar discussion taking place between Deal and Montoya. Moreover, all of the evidence in this case was that the beating occurred right after the initial attack by Irving and in the same room. This is unlike *Cavaness* where the victim was carried to a different place after he had been rendered unconscious, was beaten further, bound, and then hit again until the stated goal of getting rid of the victim was accomplished.

In pointing out that the victim's death was intentional, our Supreme Court in *Cavaness* stated:

"*By his own admission, Cavaness struck the victim several times, called the neighbor for something to use to tie up the victim, and discussed with the other men the fact that they could not let the victim leave for fear of retaliation.* The evidence demonstrated that Cavaness participated in the acts which resulted in Wheeler's death and did so intentionally. Even though Cavaness' testimony provided evidence that he did not intend to kill Wheeler by hitting him with a baseball bat, none of the evidence, even the defendant's own testimony, indicated reckless

rather than intentional conduct. [Citation omitted.]" (Emphasis added.) 278 Kan. at 477.

As a result, our Supreme Court concluded that the trial court did not err in refusing to give an instruction on unintentional second-degree murder.

The facts in this case are different from those in *Cavaness, Jones, Bailey, Clark,* and *Pierce.* Moreover, those cases presented no factual basis on which a jury might have determined that the conduct of the various defendants was reckless rather than intentional conduct. As a result, *Cavaness, Jones, Bailey, Clark,* and *Pierce* are simply not analogous to this case.

The circumstances under which a defendant can commit depraved heart second-degree murder has been outlined by Professor Emil Tonkovich in *The Kansas Criminal Code: 1992 Amendments,* 41 Kan. L. Rev., Crim. Proc. Ed. 73, 78 (1992):

" 'Depraved heart murder includes extremely reckless killings and killings resulting from actions which were intended to inflict serious bodily injury. Examples of depraved heart murder include: (1) killing a child while target shooting at school windows during school hours; and (2) *killing a person while beating him with a baseball bat with intent to severely injure him.*' 41 Kan. L. Rev., Crim. Proc. Ed. at 78." (Emphasis added.) 261 Kan. at 880.

Professor Tonkovich further noted that depraved heart second-degree murder is fundamentally similar to felony murder. In felony-murder cases, the commission of the underlying felony supplies the extreme recklessness required for criminal liability. Professor Tonkovich noted that the extremely reckless conduct in the above two illustrations is at least as dangerous to human life as most felony-murder situations.

The facts of this case fit squarely within the second highlighted illustration. Although Deal's statements indicated that he did not intend to kill Irving, his use of a tire tool to brutally beat Irving establishes that he had the intent to severely injure him. Deal's conduct of striking Irving in the head (a vital area of a person's body) with a tire tool after having taken it away from Irving showed that Deal had intended to severely injure Irving. Hence, Deal's actions furnished the extreme recklessness towards human life required for the crime of unintentional second-degree murder.

A similar factual scenario was present in *Robinson*, 261 Kan. 865, where our Supreme Court cited with approval the earlier quoted language from Professor Tonkovich. In *Robinson*, the defendant (Robinson) was convicted of depraved heart second-degree murder after he killed Richard Crowley, the initial aggressor in the incident, by striking him in the head with a golf club. The incident began when Crowley approached Jeremy Hendrickson and his three friends, one of whom was Robinson, in a park about threats that Hendrickson had made against Crowley's sons. As the confrontation became heated, Crowley hit one of the boys in the face. Crowley eventually got a metal baseball bat out of his truck and chased the boys with it, swinging at them when they got close.

While they were running away from Crowley, each boy grabbed a golf club out of a car in the park. The boys surrounded Crowley and taunted him by calling him names and swinging their clubs at him. Crowley was able to break free from the boys, but one of the boys, Tony Surber, hit Crowley in the back with a golf club. When Surber tripped and fell, Crowley hit him twice with the bat. Hendrickson then struck Crowley twice in the back or in the ribs with a golf club. Surber was able to roll away from Crowley and began to get off the ground. At that time, Robinson fatally struck Crowley in the head with his golf club. Robinson testified that he was not trying to hit Crowley in the head but was trying to hit him in the arms in order to make him stop hitting Surber with the bat. Robinson further testified that he could not remember whether his eyes were open or closed when he hit Crowley.

On appeal, Robinson argued that the evidence was insufficient to convict him of depraved heart second-degree murder for two reasons: (1) because his "extreme indifference" was directed at one specific person, Crowley, and not directed at human life in general; and (2) because he killed Crowley in an imperfect right to self-defense situation. In rejecting the defendant's first argument, our Supreme Court held that the elements of depraved heart murder could be met if the defendant manifested an extreme indifference to the value of one specific human life. Our Supreme Court held that the evidence, which indicated that Robinson swung a golf club at Crowley with great force, intending to hit Crowley, was sufficient

for the jury to find that Robinson recklessly killed a person while manifesting an extreme indifference to the value of one specific human life. 261 Kan. at 880-81.

Moreover, determining that Robinson's second sufficiency of the evidence argument lacked merit, our Supreme Court stated:

"Viewing the evidence in the light most favorable to the prosecution, Robinson struck Crowley in the head with the golf club, even though his friend, whom Crowley had struck with a bat, was getting up off of the ground and was no longer in danger. While Robinson testified that he did not aim at any particular part of Crowley's body, the State called a medical expert to the stand who testified that the golf club hit Crowley's head with direct force and was not deflected off any other part of Crowley's body. The jury could have inferred from this testimony that Robinson intentionally aimed for Crowley's head. Even if the jury could not find such intent, the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness 'manifesting an extreme indifference to the value of human life.' " 261 Kan. at 881.

As a result, our Supreme Court determined that there was sufficient evidence to convict Robinson of depraved heart second-degree murder.

Deal attempts to distinguish *Robinson* by pointing out that the defendant in *Robinson* argued that "manifesting extreme indifference to the value of human life" refers to human life in general, not to one specific human life. Deal maintains that it does not appear that the defendant in *Robinson* raised the issue of whether an intentional blow that results in an unintentional death can support a conviction for unintentional second-degree murder. Nevertheless, this is a distinction without a difference. With his second sufficiency of the evidence argument (imperfect right to self-defense), the defendant in *Robinson* directly challenged whether, based on the facts of the killing, the evidence was sufficient to convict him of unintentional second-degree murder. See K.S.A. 21-3402(b) (This subsection covers intentional killings that result from an unreasonable but honest belief that deadly force was justified in self-defense.).

Deal also attempts to distinguish *Robinson* from this case by arguing that there was at least some evidence in *Robinson* to show that the defendant acted recklessly in striking the victim with the golf club. Deal points to Robinson's testimony that he was trying

to hit the victim in the arms and not in the head and that he could not remember whether his eyes were open when he hit the victim. Nevertheless, our Supreme Court in *Robinson* did not look to only this evidence in determining that there was sufficient evidence to convict Robinson of unintentional second-degree murder. Rather, our Supreme Court determined that the jury could have inferred from the evidence "that Robinson intentionally aimed for Crowley's head." 261 Kan. at 881. Our Supreme Court then went on to state that "[e]ven if the jury did not find such intent, the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness 'manifesting an extreme indifference to the value of human life.' " 261 Kan. at 881.

Here, as in *Robinson*, the jury could have determined from the evidence that Deal intentionally aimed for Irving's head when he struck Irving with the tire tool but did not intend to kill him. The jury could have further determined that Deal was attempting to defend himself from Irving's attack when Deal was able to gain control of the tire tool and hit Irving in the head. In rejecting the defendant's sufficiency of the evidence argument in *Robinson*, our Supreme Court stated:

"The evidence was sufficient in this case for the jury to find that Robinson recklessly killed a person while manifesting an extreme indifference to the value of one specific human life — Crowley's life. *The evidence indicated that Robinson swung a golf club at Crowley with great force, intending to hit Crowley.*" (Emphasis added.) 261 Kan. at 881.

Similar to *Robinson*, the evidence in this case indicated that Deal swung the tire tool at Irving with great force, intending to hit Irving. The amount of force used by Deal and the number of times that Deal hit Irving showed that Deal recklessly killed Irving "under circumstances manifesting extreme indifference to the value of human life."

After reviewing all of the evidence in the light most favorable to the State, this court is convinced that a rational jury could have found Deal guilty of unintentional second-degree murder beyond a reasonable doubt.

*"No Duty to Retreat" Instruction*

Next, Deal contends that the trial court erred in instructing the

jury on the "no duty to retreat" rule. When a defendant objects to instructions, an appellate court is required to consider the instructions as a whole and not isolate any one instruction. Even if erroneous in some way, instructions are not reversible error if they properly and fairly state the law as applied to the facts of the case and could not have reasonably misled the jury. *State v. McKissack*, 283 Kan. 721, 732, 156 P.3d 1249 (2007).

At the jury instructions conference, the State requested the trial court to instruct the jury on the "no duty to retreat" rule. Deal objected to the instruction and argued that there was no evidence indicating that he was the initial aggressor in the incident. The trial court granted the State's request for the "no duty to retreat" instruction. The trial court noted that the evidence that Irving had told Deal to "get the fuck out" of his house and that Deal had not left justified the instruction.

The jury was thus instructed on the "no duty to retreat" rule as follows: "When on his home ground, a person is not required to retreat from an aggressor, but may stand his ground and use such force to defend himself as he believes, and a reasonable person would believe, necessary." This instruction was in accord with PIK Crim. 3d 54.17-A (2001 Supp.). The Notes on Use for this pattern instruction recognize that such an instruction is to be given only in rare situations where the defendant is attacked on his or her home ground:

> "The 'no duty to retreat' instruction is required only in infrequent factual situations, such as that found in *State v. Scobee*, 242 Kan. 421, 748 P.2d 862 (1988), with such elements as a nonaggressor defendant being followed to and menaced on home ground. *State v. Ricks*, 257 Kan. 435, 894 P.2d 191 (1995); *State v. Saleem*, 267 Kan. 100, 977 P.2d 921 (1999)." See PIK Crim. 3d 54.17-A (2001 Supp.).

It should be pointed out that in 2006, the Kansas Legislature enacted K.S.A. 21-3218, which seems to modify the circumstances under which the "no duty to retreat" rule is applicable in Kansas. K.S.A. 21-3218(a), which took effect May 25, 2006, states:

> "A person who is not engaged in an unlawful activity and who is attacked in a place where such person has a right to be has no duty to retreat and has the right to stand such person's ground and meet force with force."

This "no duty to retreat" rule was incorporated in the 2006 supplement to PIK Crim. 3d 54.17-A. The Notes on Use to PIK Crim. 3d 54.17-A state that this "no duty to retreat" instruction is now appropriate when there is evidence that the attacker first used force against the defendant.

It is apparent that to the extent that K.S.A. 21-3218 modified the "no duty to retreat" rule in Kansas, the statute would be a substantive change and would have only prospective application to offenses committed after May 25, 2006. See *State v. Shore*, No. 97,833, unpublished opinion filed December 21, 2007 (holding that to extent 2006 amendment to K.S.A. 21-3211 expanded circumstances in which lethal force would be justified by self-defense, amendment would be substantive and would apply only prospectively to offense committed after its effective date); see also *Smiley v. State*, 966 So. 2d 330 (Fla. 2007) (finding that statutory change in self-defense duty to retreat to be given prospective application under constitutional mandate); *People v. Myers*, 35 Ill. 2d 311, 220 N.E.2d 297 (1966), *cert. denied* 385 U.S. 1019 (1967) (concluding district court did not err in failing to give insanity instruction based upon newly promulgated statute in case in which crime was committed before effective date of new statute).

Deal maintains that the instant case does not fit within the infrequent factual situation where the "no duty to retreat" instruction, as contained in PIK Crim. 3d 54.17-A (2001 Supp.), should be given. Deal distinguishes this case from *State v. Scobee*, 242 Kan. 421, 748 P.2d 862 (1988). There, our Supreme Court reversed the defendant's conviction and remanded for a new trial after holding that a no duty to retreat instruction was required. In that case, two aggressors followed the defendant to his home. While the defendant was parked in his driveway, the aggressors approached the defendant, with one of them waving an iron pipe. Based on the trial court's finding, the aggressors' attack was not provoked by the defendant. The defendant shot and killed one of the aggressors. The State had built its case around the theory that the defendant had a duty to retreat, such as by driving to the police station. Defense counsel, however, was not allowed to argue that the defendant had no duty to retreat from his driveway.

Explaining its decision in *Scobee*, our Supreme Court in *Ricks*, 257 Kan. at 437, stated: "The no duty to retreat instruction is required, as indicated in *Scobee*, in infrequent factual situations such as found therein with such elements as a nonaggressor defendant being followed to and menaced on home ground." In *Ricks*, the defendant was approached in a public parking lot by two individuals. One of the individuals drove up beside the defendant's car, and a conversation ensued. Before approaching the defendant, one of the individuals had said that he would like to beat the defendant's " 'ass.' " The defendant took out his gun and shot each of the individuals three times. Our Supreme Court held that a "no duty to retreat" instruction was not required under the facts of that case. 257 Kan. at 437-38.

The determination in *Ricks* that the "no duty to retreat" instruction was limited to infrequent factual situations was cited and followed in *State v. Saleem*, 267 Kan. 100, 977 P.2d 921 (1999). In that case, the defendant was at a drinking party at his sister's home when he got into an argument with Schmidt. The defendant and Schmidt stepped outside and became involved in a shoving and pushing match. During the altercation, the defendant pulled out a gun and shot Schmidt four times. The defendant's testimony at trial was that he had been told that Schmidt was "talking shit on me . . . said he was going to fuck me up." 267 Kan. at 102. Although there was testimony to the contrary from other witnesses, the defendant testified that Schmidt was pushing him and hitting him on the head with a liquor bottle and that when Schmidt came after him with the liquor bottle, he shot Schmidt. The defendant further testified that Schmidt continued to attack him even after being shot. Determining that the facts were distinguishable from *Scobee* and more similar to *Ricks*, our Supreme Court upheld the trial court's denial of a requested "no duty to retreat" jury instruction. *Saleem*, 267 Kan. at 115.

Here, it is undisputed that Deal and Montoya pursued Irving on his home ground. The record seems unclear, however, as to whether Deal was the initial aggressor for purposes of the "no duty to retreat" rule. Deal told the police that when he went to Irving's home, he and Irving argued, and Irving told him to "get the fuck

out" of his house. Deal told the officers that at that point, Irving picked up a tire tool, which was a metal bar, and swung it at him twice.

In determining that the "no duty to retreat" instruction would be given to the jury, the trial court focused on the fact that Irving told Deal to "get the fuck out" of his house but that Deal remained there. Seemingly, Irving might have felt threatened by Deal coming to his home, starting an argument with him, and refusing to leave. Nevertheless, those facts do not rise to the level of those in *Scobee* where the aggressors approached the defendant in his driveway while one of the aggressors was waving an iron pipe in the air. Here, there were no deadly weapons brandished by Deal when the incident began. When Irving began hitting Deal, Irving had control of the only weapon involved in the incident at that time. There was no other evidence that Deal had attempted to hit or otherwise injure Irving at that point in the confrontation. Moreover, Montoya had not yet become involved in the situation. Although the "no duty to retreat" instruction properly stated the law, the facts of this case did not warrant such an instruction.

Nevertheless, the fact that the trial court gave an instruction that might have been unwarranted in a given case does not automatically require reversal. Our Supreme Court has held: " ' "Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done." ' [Citations omitted.]" *State v. Holbrook*, 261 Kan. 635, 636-37, 932 P.2d 958 (1997).

Deal contends that the "no duty to retreat" instruction could have misled the jury and caused it to believe that while Irving was justified in attacking Deal, Deal had no right to fight back in self-defense.

Nevertheless, this was not the manner in which the jury was instructed. The instruction on the "no duty to retreat" rule was an accurate statement of the law. Moreover, the jury was also accurately instructed on Deal's self-defense theory in accordance with K.S.A. 21-3211 (Furse 1995) as follows:

"The defendant raises self defense as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met

its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant."

The defendant has claimed his conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

Contrary to Deal's argument, there was nothing to mislead the jury that Deal did not have the right to fight back in self-defense. Moreover, the State never argued to the jury that Deal did not have a right to defend himself from Irving's blows.

The problem that Deal faces on this issue is that the evidence was overwhelming that his brutal beating of Irving was not done in self-defense. While arguably Deal's first blow to Irving might have been done in self-defense, the rest of the blows to Irving could not be justified as such. When Deal was able to wrestle the tire tool away from Irving, he had control of the only weapon that had been used on him. Deal himself admitted to the officers that he felt he was defending himself when he hit Irving the first time and that he struck out of anger when he hit Irving the second time. Moreover, there was no evidence that Deal had suffered major injury during the incident sufficient to warrant the brutal beating that Irving received.

Based on the record in this case, we conclude that the trial court's decision to give an instruction on the "no duty to retreat" rule did not prejudice Deal's substantial rights and that substantial justice was done in this case.

*Prior Crimes Evidence*

Next, Deal argues that the trial court erred in admitting evidence of his prior crimes. Before trial, Deal filed a motion in limine to prevent the State from introducing evidence of his reputation for criminal activity, his prior crimes of violence and dishonesty, and his abuse of drugs and alcohol without first obtaining permission from the trial court outside the presence of the jury. The trial court

granted Deal's motion in limine. The trial court held that Deal's prior drug activity occurring several years before the trial was not relevant. Moreover, the trial court ruled that the State was prohibited from offering any character evidence regarding Deal and from attacking Deal's credibility until those matters were put into issue by Deal.

At trial, the videotapes of Deal's three police interviews were played for the jury. The three interviews when played for the jury totaled just over 2½ hours. Apparently, one of the videotapes contained a reference to an arrest of Deal in California and another videotape contained a reference to Deal's previous methamphetamine use. Deal neither requested redaction of the videotapes to eliminate those references nor did he make a contemporaneous objection to the prior crimes evidence when the videotapes were played to the jury.

After the State had presented its case-in-chief to the jury and Deal had unsuccessfully moved for a judgment of acquittal, the trial court pointed out that the statements in the videotapes had violated the order in limine. The trial judge stated: "There were at least two occasions that I could see in the various interviews that came in that probably were a violation of that order, yet no contemporaneous objection was made. I just wanted to raise that issue with the parties." Deal's defense counsel responded as follows:

"Frankly, I had forgotten about the comment about Mr. Deal's prior offense, that being in this, and there were some other areas about drug usage and maybe about some arguments that he had with Miss Morris and their prior history. I guess at some point I'd make a decision, I've got video tape of my client sitting there telling basically his side of the story and I guess I figure I have to take a little bad with the good that I may be getting.

"I did not make the objection. If I made it, we would have to decide how to edit. I decided not to bring that up, not draw attention to it. I felt my client being on these videos, that's almost as good as him testifying, and that he could make a choice whether he wants to testify later or not."

On appeal, Deal now argues that the introduction of the prior crimes evidence constituted reversible error. Deal argues that the prior crimes evidence had no tendency to prove any material fact and was prejudicial to him because it affected his credibility.

*Failure to Object to Admission of Evidence*

Deal concedes that when the other crimes evidence was presented to the jury, he failed to make a contemporaneous objection to the admission of the evidence. To preserve an issue relating to the admissibility of evidence for appeal, a party must make a timely and specific objection. K.S.A. 60-404. Even if there is an in limine ruling that the evidence is admissible, where an objection to the evidence is not made when it is introduced at trial, the defendant is generally precluded from challenging its admissibility on appeal. See *State v. Carapezza,* 286 Kan. 992, Syl. ¶ 7, 191 P.3d 256 (2008) (where defendant objected to evidence only on hearsay grounds, she failed to preserve for appeal the issue of the inadmissibility of the evidence under K.S.A. 60-455); *State v. Francis,* 282 Kan. 120, 138, 145 P.3d 48 (2006) (where defendant failed to object at trial to the admission of evidence under K.S.A. 60-455, he was precluded from raising the issue on appeal); *State v. Young,* 14 Kan. App. 2d 21, 37, 784 P.2d 366, *rev. denied* 245 Kan. 788 (1989) (To preserve a K.S.A. 60-455 issue for appeal, a defendant must object on that ground at trial.). Deal, by failing to object, waived any challenge to the trial court's admission of the other crimes evidence. As a result, consideration of Deal's argument concerning the erroneous admission of evidence is precluded by his failure to make a contemporaneous objection.

*Failure to Request Redaction of Videotape*

Moreover, Deal's failure to object to the admissibility of the complained-of statements before the tape was played to the jury at trial precludes consideration of this issue on appeal. Deal never requested that the State redact the statements from the videotape or notified the trial court that the videotape contained statements violating the trial court's order in limine.

In *State v. Anthony,* 282 Kan. 201, 145 P.3d 1 (2006), the defendant argued that the videotape of his interrogation, which was played to the jury at trial, should have been redacted to remove repeated comments by the detective regarding the defendant's lack of credibility or veracity. Determining that the issue had not been properly preserved for appeal, our Supreme Court stated:

"An appeal challenging a district court judge's failure to redact an interrogation videotape to remove references to a criminal defendant's lack of veracity requires preservation of the issue at trial. Without a contemporaneous objection, an appellate court cannot assume that the playing of an unredacted interrogation videotape for a jury was something the defense wanted to avoid." 282 Kan. 201, Syl. ¶ 5.

Therefore, our Supreme Court declined to address the merits of the defendant's argument.

Our Supreme Court's holding in *Anthony* is on point here. When the videotape was played to the jury, Deal's trial counsel conceded that he made the tactical choice not to object to the references to Deal's prior crimes. Deal may not now claim on appeal that the tapes should have been redacted. Because Deal did not object to the admissibility of the prior crimes evidence in the videotapes before the tapes were played to the jury at trial, he failed to preserve this issue for appeal.

Finally, Deal's actions in this matter are akin to the doctrine of invited error. For example, defense counsel stated that the videotape interviews would allow Deal to tell "his side of the story" to the jury without being subjected to cross-examination by the State. Because defense counsel believed that this would be good trial strategy, the defense counsel did not object to the previous indiscretions that Deal had admitted to during the interviews. Defense counsel said, "I decided not to bring that up, not draw attention to it. I felt my client being on these videos, that's almost as good as him testifying . . . ." A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004). Because Deal actively contributed to what he now maintains was trial court error, we determine that his argument fails.

*Denial of Motion for Continuance*

Next, Deal contends that the trial court erred in denying him a continuance of the hearing on his motion for a new trial. A trial court's refusal to grant a continuance will not be disturbed on appeal absent a showing of an abuse of discretion. See *State v. Carter*, 284 Kan. 312, 318, 160 P.3d 457 (2007).

After the guilty verdict was rendered by the jury in this case, Deal's trial counsel moved for a judgment of acquittal or, alternatively, a new trial. Deal argued that the evidence was insufficient to convict him of second-degree reckless murder, that the trial court erred in instructing the jury on the duty to retreat, and that he was denied a fair trial based on the prosecutor's statements (to which Deal objected) during closing argument. Deal later filed a pro se motion for a new trial and for appointment of new counsel. Deal alleged that his trial counsel had been ineffective in cross-examining the State's witnesses, in failing to call witnesses in Deal's favor, in not objecting to his videotaped interviews being played to the jury, and in failing to object to certain questions that the State asked witnesses at trial.

After appointing new counsel to represent Deal in his motion for a new trial, the trial court conducted a hearing on the matter. At the hearing, Deal's new counsel requested a continuance of the matter in order to give him time to obtain a full transcript of the jury trial. Deal's counsel argued that he was at a great disadvantage not having access to the transcript and not being able to point to specific errors that occurred. Defense counsel told the trial court that he had talked to the court reporter and that the trial transcript could be completed within a few weeks.

The trial court denied Deal's request for a continuance. Concerning Deal's sufficiency of the evidence argument, the trial judge noted that it had previously made findings of fact on the record when it denied Deal's motion for a judgment of acquittal. The trial judge stated that Deal's motion for a new trial contained general allegations and that "having been [the] judge in the trial, I don't believe that there is merit to them even with review of the transcript." Moreover, the trial judge stated that Deal's sufficiency of the evidence argument was an issue that could be raised on appeal.

*Sixth Amendment Right to Counsel*

On appeal, Deal maintains that the trial court's decision interfered with his right to counsel under the Sixth Amendment to the United States Constitution and, therefore, the trial court abused its discretion in denying his request for a continuance. To support

his argument, Deal cites *State v. Andrews*, 228 Kan. 368, 614 P.2d 447 (1980). In *Andrews*, our Supreme Court stated that "an indigent defendant has a right to appointed counsel in perfecting his appeal, *including the right to a trial transcript* and the right to file an appeal without a filing fee. [Citation omitted.]" 228 Kan. at 372.

Essentially, Deal seeks to extend the Sixth Amendment right to appellate counsel outlined in *Andrews* so that a defendant arguing a motion for new trial (that includes evidentiary and ineffective assistance of counsel issues) has the right to a trial transcript. To illustrate, Deal argues that "an indigent defendant's right to appointed counsel in perfecting an appeal includes the right to a trial transcript." Deal attempts to expand the scope of that premise, which expresses an indigent defendant's right to appellate counsel in perfecting an appeal and the defendant's right to a trial transcript, by setting up the following argument:

"Mr. Deal's counsel could no more mount an effective argument at the hearing on the motion for new trial without the trial transcript than an appointed appellate attorney could mount an appeal without said transcripts."

Although Deal characterizes his argument as an analogy, it reads like a partial syllogism or *enthymeme.*

Deal's argument can be reconstructed as follows:
All appellate attorneys in perfecting appeals from indigent defendants are constitutionally entitled to trial transcripts [Major Premise];
Some trial attorneys (that are appointed after trial to handle posttrial motions for indigent defendants) are like appellate attorneys [Minor Premise];
Deal's two-part deduction leaves out an essential statement:
Therefore, all trial attorneys who are appointed after the trial to handle posttrial motions for indigent defendants should be entitled to trial transcripts [Conclusion].
Deal moves from considering part of the category of attorneys (appellate attorneys) that are constitutionally entitled to trial transcripts to broadening his claim to include all the attorneys mentioned in the conclusion. Deal's argument commits the fallacy of the illicit minor term. This results "[w]hen the minor term is un-

distributed in the minor premise but distributed in the conclusion." See Aldisert, Logic for Lawyers, p. 153 (3d ed. 1997). Here, the minor term [some trial attorneys who are appointed after trial to handle posttrial motions for indigent defendants] is not distributed in the minor premise, where it appears as the subject term in a particular affirmative categorical proposition. Logic for Lawyers, pp. 55-58.

Deal's conclusion goes beyond what the premises warrant. His conclusion makes an assertion about *all* trial attorneys appointed after trial. Nevertheless, the premises make no such contention. They say nothing about *all* trial attorneys appointed after the trial. Moreover, we acknowledge that for Deal to drive home his point, he would have to broaden his claim to *all* trial attorneys appointed after trial. Otherwise, Deal's argument is drastically weakened if he is contending that only some trial attorneys appointed after trial should be entitled to trial transcripts. Based on the latter assertion that only some trial attorneys appointed after trial should be entitled to trial transcripts, Deal's argument is enormously less appealing. For example, Deal would have to argue that his appointed trial counsel was a member of the class of some attorneys appointed after trial. Also, he would have to argue that his appointed trial counsel was a member of the class of those trial attorneys that should be entitled to trial transcripts. This second argument is very difficult. Under a particular affirmative proposition, there may be only one member of both classes. Logic for Lawyers, p. 57. Moreover, Deal's appointed trial counsel may not have been that one member of both classes.

In short, under Deal's argument as outlined in the partial syllogism, all trial attorneys appointed after trial to represent indigent defendants in posttrial matters would be entitled to trial transcripts. Consequently, Deal's conclusion goes illicitly beyond what his premises warrant.

Further, if the constitutional right to a transcript were extended to trial attorneys appointed after the trial to handle posttrial motions for indigent defendants, a defendant could indefinitely extend posttrial litigation before the trial court. For example, a defendant could file a motion for new trial, obtain appointment of new coun-

sel, and then exercise his or her right to a transcript. At that point, the trial court would be forced to delay sentencing until the posttrial motion could be resolved. The defendant who has been found guilty could be sitting in jail expending limited county resources for up to several months awaiting the completion of the trial transcript, his or her attorney's review of it, a hearing on his motion, and the trial court's decision. Even in cases where a defendant's issues obviously lack merit, the defendant would be able to unnecessarily delay sentencing by filing a posttrial motion and then obtaining appointment of new counsel. Moreover, in certain cases, the trial court would be unable to comply with the 45-day statutory time period for ruling on the motion for new trial. See K.S.A. 22-3501(2) ("A motion for a new trial shall be heard and determined by the court within 45 days from the date it is made."). As a result, Deal's argument does not afford a sound basis for expanding the constitutional right to a trial transcript to trial attorneys appointed after the trial to handle posttrial motions for indigent defendants.

This does not mean that an indigent defendant's trial attorney appointed after the trial to handle a posttrial motion for the defendant should never be allowed to obtain a trial transcript. In certain cases, the trial court might properly continue the matter for the defendant's attorney to obtain a trial transcript so that the defendant's issues can be resolved. Nevertheless, as discussed below, the instant case does not present such a situation.

*Trial Court's Decision*

As set forth previously, our review on this issue is limited to whether the trial court abused its discretion in denying Deal's request for a continuance as to the hearing on his motions for a new trial. Here, in preparing to argue Deal's motions for a new trial, Deal's new defense counsel would have had available to him Deal's videotaped interviews, the coroner's report, and the court file, which included the jury instructions. In addition, Deal's new defense counsel had obtained a copy of the closing arguments in the case. Deal's new defense counsel could talk to Deal's trial counsel, the prosecutor, the defendant, and the witnesses who had testified at trial or had been identified by Deal. Finally, the trial court had

seen firsthand the conduct by Deal's former counsel and the evidence presented to the jury at trial. Under such circumstances, there was no abuse of discretion in the trial court's denial of Deal's request for a continuance.

*Issues in Deal's Motions for a New Trial*

Moreover, a review of the appellate record reveals that the issues in Deal's motions for a new trial had either already been ruled upon by the trial court, had a sufficient record from which Deal's new trial counsel could review and argue the issue on its merits, were conclusory allegations, or clearly lacked merit.

Specifically, in denying Deal's motion for a judgment of acquittal, the trial court had already determined that the State had presented sufficient evidence for the jury to convict Deal of the second-degree murder charge. Also, during the jury instructions conference, the trial court had rejected Deal's argument that the jury should not be instructed on the "no duty to retreat" rule. Moreover, we have determined in the previous issues that Deal's sufficiency of the evidence and jury instruction arguments lack merit.

In addition, at the hearing on Deal's motions for a new trial, Deal's counsel told the trial court that he had obtained a transcript of the closing arguments. Therefore, Deal's counsel could review and argue Deal's claims of prosecutorial misconduct.

Finally, many of Deal's arguments on his ineffective assistance of counsel claim were conclusory allegations concerning his counsel's performance. For example, Deal alleged that there were "other avenues of defense" that should have been litigated in his case. Nevertheless, Deal failed to specify what those other avenues of defense would have been and how they would have affected the outcome of the trial. Similarly, Deal alleges that he had a list of witnesses that would have established reasonable doubt but that his trial counsel chose to call only one witness. Deal, however, never specified who those witnesses were, what their testimony would have been, and how they would have affected his defense. The trial court did not err in failing to continue the motion for a new trial hearing on such conclusory allegations.

Deal further claimed that he attempted to get his trial counsel to object to evidence when "[t]he State commented and/or implied and/or stated issues surrounding" Morris; when the State "made comments and/or implied and/or stated the defendant's usage of drugs and/or alcohol"; and when the State "made comments and/or implied and/or stated the defendants criminal activities, had prior charged and/or uncharged crime(s) of violence or otherwise." Nevertheless, Deal never specifies the comments that were made by the State. Moreover, to the extent that those comments were made in closing arguments, Deal's counsel had a copy of the closing arguments at the motion for a new trial hearing and argued the prosecutorial misconduct issue. As a result, no continuance was necessary on that issue.

The remainder of Deal's arguments on his ineffective assistance of counsel claim clearly lacked merit and, therefore, did not warrant the trial court granting Deal's motion for a continuance. Specifically, Deal claimed that his attorney was ineffective for failing to object to the videotaped interviews when his attorney knew that they were a direct violation of the order in limine. Deal seemed to contend that the entirety of the videotaped interviews would have been inadmissible. Nevertheless, the only statements that Deal has pointed to in those videotapes are his references to his prior crimes. Even if Deal's attorney would have objected to those statements, the most he could have obtained would have been redaction of the prior crimes references.

Importantly, Deal's references to his two prior crimes were momentary during the 2½ hours of videotaped interviews. During the interviews, Deal explained that he had been arrested for grand theft auto after he bought a stolen automobile and tried to register it with the Department of Motor Vehicles. In addition, Deal admitted that he had used methamphetamine in the past but had not done so for 9 months since moving to Kansas. The prior crimes evidence was not of a similar nature and had no relation to the crime charged in this case. Although arguably the references to Deal's prior crimes were inadmissible evidence, they had no bearing on the jury's verdict in this case.

Deal further alleged in his motion for a new trial that his trial counsel was ineffective because there were statements available indicating that Irving might have died from excessive blood loss in his right leg. Deal pointed to an officer's incident reports and a probable cause affidavit in which statements were made that Irving had a large amount of blood around Irving's right leg area. Nevertheless, testimony about the large amount of blood around Irving's right leg had already been introduced to the jury at trial. The trial judge hearing the motions for a new trial had presided over Deal's trial and was well aware of the evidence presented to the jury. Even with a trial transcript, Deal's arguments would not have had any merit. Accordingly, there was no abuse of discretion in the trial court's denial of Deal's motion for a continuance.

*Sentencing*

Next, Deal contends that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), when it sentenced him to the aggravated sentence in the applicable sentencing grid box without proving the aggravating factors beyond a reasonable doubt to a jury.

Our Supreme Court recently rejected this same argument in *State v. Johnson*, 286 Kan. 824, 190 P.3d 207 (2008). Our Supreme Court held that because the Kansas Sentencing Guidelines Act (KSGA) provides the trial court with discretion to impose any sentence within the presumptive range, the prescribed statutory maximum sentence under *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007), is the high number in the applicable sentencing grid box. Therefore, a sentence to any term, including an aggravated term, within the range in a KSGA presumptive grid box does not violate *Cunningham* or *Apprendi*. *Johnson*, 286 Kan. at 851. Moreover, because a sentence that falls within the applicable grid box is a presumptive sentence, appellate courts lack jurisdiction to consider a challenge to such sentence under K.S.A. 21-4721(c). Appellate courts lack jurisdiction even if the sentence is to the longest term in the presumptive grid box for a defendant's convictions. *Johnson*, 286 Kan. at 851-52.

This court is duty bound to follow our Supreme Court precedent in *Johnson*, absent some indication the court is departing from its previous position. *State v. Singleton*, 33 Kan. App. 2d 478, 488, 104 P.3d 424 (2005). As a result, Deal's argument on this issue fails.

*Criminal History*

Finally, Deal contends that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution under *Apprendi*, 530 U.S. 466, when it sentenced him to an increased sentence, based upon his criminal history, without requiring that the State prove his criminal history beyond a reasonable doubt to a jury. Deal concedes that this issue is controlled by our Supreme Court's decision in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *Singleton*, 33 Kan. App. 2d at 488. Because our Supreme Court has consistently followed its position in *Ivory*, we are unable to grant relief to Deal on this issue.

Affirmed.

LEBEN, J., concurring: I join in Judge Green's excellent opinion with one minor caveat: I do not believe the evidence necessarily leads to the conclusion that the victim, Donnie Irving, initially swung a tire iron at the defendant, Dana Deal. Such a conclusion necessarily relies on Deal's self-serving statements. But we have several reasons to question whether Deal's statements on that point are accurate.

Deal admitted that his emotions had gotten out of control over what Irving had supposedly done to Deal's girlfriend. Deal came to Irving's residence in a pickup truck that had a variety of tools in it, including tire-changing equipment. Yet under Deal's story, Irving had a tire iron in his living room, ready for battle, even though he didn't know Deal was coming by. It seems much more likely that the tire tool came from Deal's truck, and Deal referred to it as "my bar" in his later walk-through of the murder scene. After the attack, Deal took both the knife and the tire tool with him

when he left Irving's residence, and he disposed of both of them. Deal also left the scene with his vehicle lights off. Deal's stories to police were inconsistent, and other parts seemed unlikely (such as Deal's statement that he came to Irving's home just to get Irving's side of the story). I do not want to leave the impression that we have necessarily accepted what Deal said occurred as an accurate account.

Even so, I agree fully with Judge Green's legal conclusions. In looking at sufficiency of the evidence, we must look at the evidence in the light most favorable to the jury's verdict, and it convicted Deal of unintentional second-degree murder. In that light, sufficient evidence supports the verdict for the reasons stated by Judge Green. Similarly, even if Irving did not strike the first blow, there was no error in giving a legally accurate self-defense instruction, given the conflicting evidence presented to the jury.