Nos. 98,292
98,952

STATE OF KANSAS, *Appellee*, v. DANA WAYNE DEAL, *Appellant*.

(269 P.3d 1282)

Opinion filed February 17, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*James R. Spring*, deputy county attorney, argued the cause, and *Christopher E. Smith*, county attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Dana Wayne Deal appeals, arguing in part there is insufficient evidence to support his conviction for unintentional but reckless second-degree murder in violation of K.S.A. 21-3402(b). Deal argues the evidence established that he intentionally hit Donald Irvin with a metal tire iron and Irvin died as a result of these intentionally inflicted blows. Because Deal acted intentionally in inflicting these blows, he argues he cannot be guilty of unintentional but reckless second-degree murder.

On direct appeal, the Court of Appeals rejected this argument and affirmed Deal's conviction and sentence. *State v. Deal*, 41 Kan. App. 2d 866, 206 P.3d 529 (2009). On review of that decision, we affirm the Court of Appeals and the jury verdict. We hold that K.S.A. 21-3402 focuses culpability on whether a killing is intentional, not on whether a deliberate and voluntary act leads to death. In this case, there is evidence that Deal did not intend to kill Irvin, and this evidence is sufficient to support the jury's determination that Deal committed an unintentional but reckless second-degree murder.

In addition, we reject Deal's other arguments that the jury was misled by a "no duty to retreat" jury instruction and that his sentence is unconstitutional because the jury did not determine he should be sentenced to the longest term in the applicable grid box or his criminal history.

## FACTS AND PROCEDURAL BACKGROUND

Deal's conviction was based on events that occurred on the night of July 8, 2005, and the early morning of July 9, 2005. Between 11 p.m. and midnight, Ric Montoya knocked on the door of Irvin's next door neighbor, Karla Halstead, and asked if Irvin was there. Halstead noticed that Montoya was intoxicated and was unable to understand her as she explained he had the wrong house. Halstead eventually closed the door and left Montoya standing on her front porch.

About 45 minutes later, Halstead looked out of her kitchen window and saw Montoya and another man coming out of the side door of Irvin's house. Although Halstead knew Montoya, she did not recognize the other man. Halstead saw the unidentified man walk across the street and throw an object over a 10- to 12-foot dike on the north side of the street. Halstead then saw the unidentified man and Montoya get into a white pickup truck and drive away with the headlights off.

Someone made a 911 call regarding a disturbance at Irvin's house, and law enforcement officers and emergency medical services (EMS) personnel responded. The first officer to arrive saw an open side door and a person, who was later identified as Irvin, lying on the floor. Irvin was unresponsive and appeared to have lost a large amount of blood. He was declared dead at the hospital.

As law enforcement officers investigated Montoya's possible involvement, they learned Montoya had been with Deal around the time of the incident. They contacted Deal, who agreed to talk to officers. After being *Mirandized*, Deal initially denied being at Irvin's house during the night. Deal's statement changed, however, after officers told Deal his truck had been seen at Irvin's house, a neighbor had identified Montoya, and they knew he had been with Montoya that night.

Faced with that information, Deal admitted to fighting Irvin and explained what led to the fight. Specifically, he told the officers he and Montoya were driving around the previous night when Montoya told him Irvin had kept Deal's girlfriend at Irvin's residence for 3 days during which time Irvin had drugged and sexually abused

her. Because Deal wanted to get Irvin's side of the story, he drove to Irvin's house.

Deal's statement was consistent with Halstead's account; he indicated that Montoya, who Deal described as being drunk, initially went to the wrong house. Deal, however, knocked on Irvin's door and confronted Irvin about the alleged incident with Deal's girlfriend. Deal and Irvin argued, and Irvin told Deal to get out of his house. At that point, according to what Deal told the officers, Irvin picked up a metal tire iron and swung it at Deal twice. Deal reported he was able to block the blows with his arms. But the officers did not see any scrapes or red marks evident at that point in time.

Deal told the officers he kicked Irvin in the groin, grabbed the tire iron away from Irvin, and struck Irvin twice with the tire iron—one time in the head and one time in the left shoulder area. In a later written statement, however, Deal indicated he struck Irvin once in the front right area of his head and another time in his right head and neck area, when Irvin "came at me again." During his interview, Deal further stated that when Irvin fell to the floor, he kicked Irvin "in the ass." According to Deal, Montoya came into the room while he was kicking Irvin. Deal indicated Montoya "poked and sliced" at Irvin with a fillet knife. Montoya also kicked Irvin several times.

When Deal and Montoya left Irvin's house, according to Deal's written statement, Irvin was "on the floor moaning" and was "beat down but not hurt to [sic] bad." Deal told the officers he knew Irvin was hurt but he did not mean to kill Irvin. According to Deal, Irvin did not deserve to die no matter what he had done.

Officers later found a tire iron, which was approximately 18 to 20 inches long, and a fillet knife on the north side of the dike near Irvin's house. In addition, officers found a variety of tools, including tire-changing and jack equipment, in Deal's truck.

On July 10, 2005, Deal agreed to do a "walk-through" interview at Irvin's house. Once during the interview, Deal referred to the tire iron used during the incident as "my bar." Deal told the officers his emotions got out of hand when Irvin showed disrespect towards his girlfriend. Deal stated he was not thinking during the incident,

he felt he was defending himself when he hit Irvin the first time, and he struck out of anger when he hit Irvin the second time. Deal told the officers he knew Irvin carried knives and guns, and he believed Irvin might have kept a gun or knife in the corner of the room. During the "walk-through" interview, one of the officers noticed a small red mark on Deal's forearm that had not been observed the previous day. Deal flinched when the officer touched it.

Deal provided additional information at subsequent interviews. In an interview conducted on July 11, 2005, Deal mentioned that Irvin had pointed a squirt gun at him. On February 15, 2006, a videotaped deposition was taken of Deal. During the deposition, Deal went into detail about a .38 caliber gun that Irvin possessed. He also described a modified paintball gun owned by Irvin that shot "steel" bullets that "would go through a two-by-four." This was the first time Deal had mentioned the .38 caliber or the modified paintball gun.

Dr. Lawrence Czarnecki conducted the autopsy on Irvin's body. At trial, Dr. Czarnecki testified Irvin had blunt force injuries to his head, chest, abdomen, left shoulder area, legs, and head. Describing the injuries to each of these areas of the body, Dr. Czarnecki explained that Irvin sustained a depressed fracture to his head and Irvin's skull had been pushed into his brain; the head injuries were on both the left and right side of the head. Irvin sustained four rib fractures and breaks in each forearm. There were lacerations, abrasions, and contusions on Irvin's arms and legs. Irvin also had a ⅜-inch incision on his right leg, but that injury was not enough to kill him. Dr. Czarnecki opined that the cause of Irvin's death was multiple blunt and sharp force injuries; nevertheless, Irvin's blunt force injuries to his head were enough to kill him.

Deal was initially charged with premeditated first-degree murder in violation of K.S.A. 21-3401(a) or, alternatively, felony murder in violation of K.S.A. 21-3401(b). Before the conclusion of the preliminary hearing, Deal entered into an agreement with the State: Deal agreed to testify against Montoya, and the State agreed to reduce the charge against Deal to unintentional but reckless second-degree murder in violation of K.S.A. 21-3402(b). (In the

cases we will discuss, there are various terms used as shorthand labels for violations of this statute, including reckless second-degree murder, depraved heart murder, unintentional murder, and unintentional but reckless murder; we will refer to the violations as unintentional but reckless second-degree murder.)

In addition to instructing the jury on unintentional but reckless second-degree murder, the trial court also gave jury instructions on the lesser included offenses of voluntary manslaughter and involuntary manslaughter. The jury ultimately convicted Deal of unintentional but reckless second-degree murder. Deal was sentenced to 168 months in prison, which represented the aggravated number in the appropriate sentencing grid box.

As previously noted, Deal appealed to the Court of Appeals, which affirmed his conviction and sentence. *Deal*, 41 Kan. App. 2d 866. Deal then filed a petition for review, which we granted. Consequently, our jurisdiction arises under K.S.A. 20-3018(b) (petition for review) and K.S.A. 22-3602(e) (same). See Supreme Court Rule 8.03 (2011 Kan. Ct. R. Annot. 69).

### SUFFICIENCY OF THE EVIDENCE

First, Deal argues the State failed to present sufficient evidence to convict him of unintentional but reckless second-degree murder under K.S.A. 21-3402(b). K.S.A. 21-3402 states: "Murder in the second degree is the *killing* of a human being committed: (a) *Intentionally*; or (b) *unintentionally* but recklessly under circumstances manifesting extreme indifference to the value of human life." (Emphasis added.)

Our standard for reviewing a sufficiency of the evidence argument is well established: The standard of review requires us to review all the evidence in the light most favorable to the State. If, when the evidence is viewed in this light, a rational factfinder could have found the defendant guilty beyond a reasonable doubt, we must affirm. *State v. Martinez*, 290 Kan. 992, 1003, 236 P.3d 481 (2010).

In raising this issue, Deal contends all the evidence presented by the State showed he acted intentionally in beating Irvin, and neither the State nor the defense presented any evidence he acted

unintentionally but recklessly. In making this argument, Deal focuses on the voluntariness of his actions of hitting Irvin, stating: "It is not enough . . . to show that Irvin's *death* was unintentional but reckless; the State must show that the action that *caused* the death was unintentional but reckless." Because (1) Deal intended to hit Irvin with the metal bar, (2) he swung at Irvin's head area, and (3) death resulted, Deal argues the killing was intentional not reckless.

### Court of Appeals' Analysis

Rejecting these arguments, the Court of Appeals determined there was sufficient evidence to support the jury's verdict that Deal had unintentionally but recklessly caused Irvin's death. In reaching this conclusion, the Court of Appeals relied heavily on *State v. Robinson*, 261 Kan. 865, 873, 934 P.2d 38 (1997). In that case, Robinson had been convicted of unintentional but reckless second-degree murder after he killed Richard Crowley, who "was clearly the initial aggressor." *Robinson*, 261 Kan. at 867. The incident that led to Crowley's death began when Crowley approached Jeremy Hendrickson and his three friends, one of whom was Jerry Robinson, about threats Hendrickson had made against Crowley's sons. As the confrontation became heated, Crowley hit one of the boys in the face. Crowley eventually pulled a metal baseball bat out of his truck and chased the boys with it, swinging at them when they got close.

While they were running away from Crowley, each boy grabbed a golf club out of a nearby car. The boys surrounded Crowley and taunted him by calling him names and swinging their clubs at him. Crowley was able to break free from the boys, but one of them hit Crowley in the back with a golf club. When one of the boys tripped and fell, Crowley hit him twice with the bat. Hendrickson then struck Crowley twice in the back or in the ribs with a golf club. The boy who had fallen to the ground was able to roll away from Crowley and began to get off the ground. At that time, Robinson fatally struck Crowley in the head with his golf club. Robinson testified that he was not trying to hit Crowley in the head but was trying to hit him in the arms in order to make him stop hitting his

fallen friend with the bat. Robinson also testified that he could not remember whether his eyes were open or closed when he hit Crowley.

On appeal, Robinson argued the evidence was insufficient to convict him of unintentional but reckless second-degree murder for two reasons: (1) because his "extreme indifference" involved only one specific person, Crowley, and not human life in general; and (2) because he killed Crowley in an imperfect right to self-defense situation. In rejecting the defendant's first argument, this court held the elements of unintentional but reckless second-degree murder could be met if a defendant manifested an extreme indifference to the value of a specific human life as compared to human life in general. *Robinson*, 261 Kan. at 880. Additionally, this court held the evidence, which indicated Robinson swung a golf club at Crowley with great force, intending to hit him, was sufficient for the jury to find that Robinson recklessly killed a person while manifesting an extreme indifference to the value of one specific human life. *Robinson*, 261 Kan. at 881.

The *Robinson* court recognized the jury could have found that Robinson intentionally struck Crowley in the head in defense of Robinson's friend, which would have gone to the defense theories of self-defense or imperfect self-defense. But, when the evidence was viewed in the light most favorable to the verdict, "the jury could have found that blindly swinging a golf club at a person with great force constitutes extreme recklessness 'manifesting an extreme indifference to the value of human life.'" *Robinson*, 261 Kan. at 881. In other words, there was reckless conduct of wildly swinging the club as well as a reckless disregard for the risk of death in circumstances that showed an extreme indifference to the value of an individual human life.

In this case, the Court of Appeals discussed a portion of the *Robinson* court's analysis regarding whether action aimed at one person was covered by the statute, noting this discussion provided support for the State's view of the evidence in this case. Specifically, the *Robinson* court had pointed to an article written by Professor Emil Tonkovich in *The Kansas Criminal Code: 1992 Amendments*, 41 Kan. L. Rev., Crim. Proc. Ed. 73, 78 (1993). Professor

Tonkovich was a member of the Kansas Judicial Council Criminal Law Advisory Committee that proposed the initial version of the 1992 Kansas Criminal Code amendments in which second-degree murder was expanded to include unintentional but reckless killings under circumstances manifesting an extreme indifference to the value of human life.

Professor Tonkovich explained Kansas' unintentional but reckless second-degree murder provision was modeled after the same provision in the Model Penal Code. Professor Tonkovich also discussed some of the Committee's comments, stating:

"Depraved-heart [unintentional but reckless second-degree] murder includes extremely reckless killings and killings resulting from actions which were intended to inflict serious bodily injury. [Citation omitted.] Examples of depraved heart murder include: (1) killing a child while target shooting at school windows during school hours; and (2) *killing a person while beating him with a baseball bat with intent to severely injure him.*" (Emphasis added.) 41 Kan. L. Rev., Crim. Proc. Ed. at 78.

As the Court of Appeals in this case noted, the two cited examples describe voluntary and deliberate conduct: a gun is fired for target practice or a baseball bat is swung. Although the firing of the gun and the swinging of the bat were intentional, voluntary acts, each voluntary act resulted in an unintentional killing because the actors did not have the conscious objective to kill or a conscious awareness that their actions would result in the killing of a human being. In the example most like the facts of this case, Professor Tonkovich described using the baseball bat with the intent to beat, not the intent to kill, but in circumstances manifesting extreme indifference to the value of human life.

Applying this analysis to the facts of this case, the Court of Appeals majority concluded Professor Tonkovich's second example was comparable to the circumstances of this case. The majority explained:

"Although Deal's statements indicated that he did not intend to kill Irvin, his use of a tire tool to brutally beat Irvin establishes that he had the intent to severely injure him. Deal's conduct of striking Irvin in the head (a vital area of a person's body) with a tire tool after having taken it away from Irvin showed that Deal had intended to severely injure Irvin. Hence, Deal's actions furnished the extreme

recklessness towards human life required for the crime of unintentional second-degree murder." *Deal*, 41 Kan. App. 2d at 875.

In other words, according to the Court of Appeals, despite Deal's commission of an intentional beating, the unintended result of death and attendant circumstances showing an extreme disregard for the value of human life placed this crime in the category of unintentional but reckless second-degree murder.

One member of the Court of Appeals panel concurred in the holding but noted there were reasons to distrust Deal's self-serving statements. He observed, however, that it was not necessary to accept Deal's statements to affirm the verdict because, "[i]n looking at the sufficiency of the evidence, we must look at the evidence in the light most favorable to the jury's verdict," and other evidence supported the verdict. *Deal*, 41 Kan. App. 2d at 895 (Leben, J., concurring).

Regardless of whether Deal's statements were factored into the analysis, the Court of Appeals panel members all agreed a rational jury could have found Deal guilty of unintentional but reckless second-degree murder because "[t]he amount of force used by Deal and the number of times that Deal hit Irvin showed that Deal recklessly killed Irvin 'under circumstances manifesting extreme indifference to the value of human life.' " *Deal*, 41 Kan. App. 2d at 878.

*Deal's Arguments on Review*

In his petition for review, Deal distinguishes *Robinson* on several grounds. First, Deal notes, *Robinson* focused on the validity and application of the "manifesting extreme indifference" language in the unintentional but reckless second-degree murder statute. That language is not at issue in the present case. Second, Deal notes the *Robinson* court was not presented with the issue of whether an intentional blow or strike resulting in an unintended death can support a conviction for unintentional but reckless second-degree murder. While both of these points are valid, neither undercuts the validity of the Court of Appeals' reliance on the *Robinson* analysis. This is because the *Robinson* analysis overlaps with and touches on the question of whether a deliberate and voluntary act

can result in an unintentional but reckless killing, the issue presented by Deal. And that analysis supports the Court of Appeals' application of the statute in this case and the conclusion that a deliberate and voluntary act can result in an unintentional but reckless killing if the specific intent to kill, as required by K.S.A. 21-3402(a), is not proven.

Deal also distinguishes *Robinson* by arguing there is no evidence in this case similar to the evidence that Robinson swung the golf club "blindly" by closing his eyes and was trying to hit the victim in the arms, not the head. *Robinson*, 261 Kan. at 881. He suggests there is, therefore, no support for the State's argument that Deal struck the victim "wildly and blindly, [and] did not know where on the victim's person he had struck him." We agree with Deal; unlike the circumstances in *Robinson*, there is no evidence Deal swung "blindly," failed to take aim, or missed his mark. Rather, by his own admission, Deal used the tire iron to purposefully hit Irvin in the neck, shoulder, and head. Nevertheless, this distinction does not make the analysis in *Robinson* inapplicable because blind conduct, while one form of reckless conduct, is not the only type of conduct that can be reckless; even an intentional blow can result in an unintentional but reckless killing. Once again, this point is illustrated by Professor Tonkovich's example of an unintentional but reckless second-degree murder resulting when a baseball bat is used with the purpose of injuring someone, meaning that the blows are intentionally struck on the body of the victim so that an injury results. The critical point illustrated in the example is that it is not the intent to inflict a blow but the intent to kill that is the focal point.

Deal also suggests, however, that in addition to the lack of evidence of blind or wild swinging of the tire iron the facts of this case are more like the circumstances in several Kansas cases that focused on whether a defendant's conduct was intentional. In each of the cases cited by Deal, the focus was on whether a defendant convicted of an intentional homicide—premeditated first-degree murder or intentional second-degree murder—for shooting, strangling, or beating a victim was entitled to a lesser included offense instruction on unintentional but reckless second-degree murder.

See *State v. Cavaness*, 278 Kan. 469, 101 P.3d 717 (2004) (beating and torturing; premeditated first-degree murder); *State v. Jones*, 267 Kan. 627, 984 P.2d 132 (1999) (manual strangulation; intentional second-degree murder); *State v. Bailey*, 263 Kan. 685, 952 P.2d 1289 (1998) (shooting; intentional second-degree murder), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006); *State v. Clark*, 261 Kan. 460, 931 P.2d 664 (1997) (shooting; premeditated first-degree murder); *State v. Pierce*, 260 Kan. 859, 927 P.2d 929 (1996) (shooting; premeditated first-degree murder).

Because each of these cases dealt with a claim of error based on the district court's failure to give a lesser included offense instruction, this court evaluated whether the jury could have reasonably convicted the defendant of the lesser offense; if not, it was not error to fail to give the instruction. See K.S.A. 22-3414(3); *State v. Simmons*, 282 Kan. 728, 741-42, 148 P.3d 525 (2006) (stating standard of review). In each case, we concluded there was no error in failing to give the instruction, despite the defendant's comment that he did not intend to kill the victim. This means, according to Deal, "a defendant does not act unintentionally but recklessly where the evidence establishes that death was an unintended consequence of an intentional act." Contrary to Deal's argument, the. facts of these cases do not necessarily support this conclusion. In each case, there were facts to support the appellate court's conclusion that a jury could not have reasonably convicted the defendant of unintentional but reckless second-degree murder.

More critically, the language of K.S.A. 21-3402 does not support Deal's argument. Rather, the unambiguous language of this statute requires the killing—the result—to be either intentional or unintentional. Based on this language, this court has recognized that K.S.A. 21-3402(a), the provision relating to intentional second-degree murder, defines a specific intent crime; a defendant must have the specific intent to kill. *State v. Hayes*, 270 Kan. 535, 543, 17 P.3d 317 (2001); *State v. Pope*, 23 Kan. App. 2d 69, 73, 927 P.2d 503 (1996), *rev. denied* 261 Kan. 1088 (1997); see *Richie v. State*, 149 S.W.3d 856, 857 (Tex. App. 2004) ("murder is known as a 'result of conduct offense.' [Citation omitted.] . . . That is, the

statute requires the accused to have had a particular mind set . . . *viz* the prohibited result.").

On the other hand, under K.S.A. 21-3402(b) the result—the killing—must be unintentional. 1 LaFave & Scott, Substantive Criminal Law §§ 5.1, 5.2 (2d ed. 2003) (criminal culpability for reckless murder is defined in the Model Penal Code by looking at the attendant circumstances and the result). While the Kansas Legislature has not further defined an "unintentional" killing, it has defined "intentional conduct." Under the definition in K.S.A. 21-3201(b), conduct is intentional if it is "purposeful," "willful," "knowing," and "not accidental." To be an unintentional killing, the killing must be the opposite of these things. *State v. Shannon*, 258 Kan. 425, 429, 905 P.2d 649 (1995) (defendant cannot intend an unintentional crime).

But, even though the killing is unintentional, the legislature imposed a requirement that the killing be committed "recklessly." The legislature did not define "recklessly" but did define "reckless conduct" as "conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." K.S.A. 21-3201(c). Citing this definition, we recently explained that for a defendant's conduct to be reckless the defendant "must know that he or she is putting others in imminent danger . . . but need not foresee the particular injury that results from his or her conduct" for the conduct to be reckless. *State v. Gatlin*, 292 Kan. 372, 377, 253 P.3d 357 (2011); see also *State v. Bolton*, 274 Kan. 1, 8, 49 P.3d 468 (2002) (reckless second-degree murder is an unintentional killing that requires reckless behavior). Substituting these definitions for the defined terms, an unintentional but reckless second-degree murder in violation of K.S.A. 21-3402(b) is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge the victim is in imminent danger, although death is not foreseen. See, *e.g.*, See *State v. Tahah*, 293 Kan. 267, 272, 262 P.3d 1045 (2011) (defendant stated he was lowering rifle when " 'a round went off' " and " 'I didn't want to kill her' "); *State v. Cordray*, 277 Kan. 43, 56, 82 P.3d 503 (2004) (evidence sufficient to support jury verdict of un-

intentional but reckless second-degree murder where the defendant fired a gun in the general direction of a vehicle at night, striking an occupant); see also *State v. Jones*, 27 Kan. App. 2d 910, 915, 8 P.3d 1282 (2000) (held jury could have found evidence supporting recklessness where witnesses testified defendant shot gun randomly over crowd of people with eyes closed).

Deal essentially asks us to ignore the statute's focus on whether the *killing* is intentional or unintentional. We cannot do so; basic rules of statutory interpretation prohibit us from ignoring the clear meaning of the statute. See *State v. Urban*, 291 Kan. 214, 216, 239 P.3d 837 (2010) (discussing rules of statutory interpretation and construction); *Manly v. City of Shawnee*, 287 Kan. 63, 70, 194 P.3d 1 (2008) ("court was not imbued with the discretion or authority to ignore the legislature's words in its quest to divine what the law should or should not be").

We recognize, however, that there is language in the cases cited by Deal that focused on whether the conduct was intentional rather than whether the killing was intended. *E.g., Jones*, 267 Kan. at 633 ("actions were intentional and not reckless"); *Bailey*, 263 Kan. at 690 (defendant "contends that an intentional act done without regard to the consequences is reckless. Neither the case law nor the legislative history supports this argument."); *Pierce*, 260 Kan. at 867 ("The defendant's actions were intentional.").

Notwithstanding the contrary language in this court's previous decisions, today we hold that K.S.A. 21-3402 focuses culpability on whether a killing is intentional or unintentional, not on whether a deliberate and voluntary act leads to death. In the present case, the facts most favorable to the State are that Deal went to Irvin's house to get Irvin's side of the story, Irvin became physically aggressive and tried to hit Deal with the tire iron, Deal wrestled the tire iron away, and Deal, without an intent to kill, struck Irvin one time in the shoulder area and one time in the head. While Deal acted deliberately, he denied he intended to kill, and it cannot be said that death, as opposed to serious injury, is a substantially certain result of hitting someone in the head with a metal bar, albeit a risk and even a probable risk. As a result, there were circumstances that showed a realization of danger and a conscious and

unjustifiable disregard of that danger in circumstances manifesting an extreme indifference to the value of human life. In other words, the evidence was sufficient to establish an unintentional but reckless second-degree murder in violation of K.S.A. 21-3402(b).

## "No Duty to Retreat" Jury Instruction

Next, Deal argues reversible error occurred when the trial court gave the "no duty to retreat" instruction. The "no duty to retreat" instruction was requested by the State during the instruction conference after the trial court decided to grant Deal's request for a self-defense instruction. The instruction stated:

"When on his home ground, a person is not required to retreat from an aggressor, but may stand on his ground and use such force to defend himself as he believes, and a reasonable person would believe, necessary."

This instruction is identical to the pattern instruction formerly provided in PIK Crim. 3d 54.17-A (2001 Supp.).

Deal objected to the instruction, arguing there was no evidence he was the initial aggressor. The trial court rejected this argument because there was evidence that Irvin told Deal to get out of his house, but Deal did not leave. According to the trial judge, "This is a unique situation where I think the jury has the opportunity to find as a question of fact who was the initial aggressor, if any." In addition, the trial court instructed the jury on self-defense, in accordance with K.S.A. 21-3211 (Furse 1995). Among other instructions, the trial court explained; "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force."

On appeal, Deal argues the trial evidence did not establish the unusual circumstances that have justified giving the instructions in past cases, citing *State v. Saleem*, 267 Kan. 100, 977 P.2d 921 (1999); *State v. Ricks*, 257 Kan. 435, 894 P.2d 191 (1995); and *State v. Scobee*, 242 Kan. 421, 748 P.2d 862 (1988).

The Court of Appeals agreed, holding that "[a]lthough the 'no duty to retreat' instruction properly stated the law, the facts of this case did not warrant such an instruction." *Deal*, 41 Kan. App. 2d at 882. But the court noted that, "[e]ven if erroneous in some way,

instructions are not reversible error if they properly and fairly state the law as applied to the facts of the case and could not have reasonably misled the jury. *State v. McKissack*, 283 Kan. 721, 732, 156 P.3d 1249 (2007)." *Deal*, 41 Kan. App. 2d at 879. Concluding that reversal was not warranted, the Court of Appeals explained:

"Contrary to Deal's argument, there was nothing to mislead the jury that Deal did not have the right to fight back in self-defense. Moreover, the State never argued to the jury that Deal did not have a right to defend himself from Irvin's blows.

"The problem that Deal faces on this issue is that the evidence was overwhelming that his brutal beating of Irvin was not done in self-defense. While arguably Deal's first blow to Irvin might have been done in self-defense, the rest of the blows to Irvin could not be justified as such. When Deal was able to wrestle the tire tool away from Irvin, he had control of the only weapon that had been used on him. Deal himself admitted to the officers that he felt he was defending himself when he hit Irvin the first time and that he struck out of anger when he hit Irvin the second time. Moreover, there was no evidence that Deal had suffered major injury during the incident sufficient to warrant the brutal beating that Irvin received." *Deal*, 41 Kan. App. 2d at 883.

On petition for review, Deal disagrees with some of the Court of Appeals' reasoning that led it to conclude the instruction should not have been given. In addition, he disagrees with the conclusion the error was harmless.

Ordinarily, even though the outcome of the Court of Appeals' determination of error is favorable to an appellant, because of the precedential effect of the opinion we would address an appellant's argument that there were flaws in the Court of Appeals analysis. Here, however, as a practical matter, the Court of Appeals opinion has no precedential value. This is because, as the Court of Appeals noted, after Deal's trial, the pattern instruction at issue was amended to reflect legislative changes to Kansas' self-defense statutes. See K.S.A. 2006 Supp. 21-3218(a); PIK Crim. 3d 54.17-A (2006 and 2007 Supp.). Then, after the Court of Appeals decision, the 2010 legislature further amended Kansas' statutes regarding self-defense, leading the PIK committee to determine the instruction was no longer necessary and to delete it from the recommended instructions. See PIK Crim. 3d 54.17-A (2010 Supp.). Because the instruction is no longer necessary under any

circumstances, we conclude no purpose would be served by a discussion of the caselaw underlying the instruction, especially because we agree with the Court of Appeals that the error, if any, did not mislead the jury and was not reversible error.

In arguing we should reverse the conviction, Deal takes exception with the Court of Appeals' statement that the State never argued to the jury that Deal did not have a right to defend himself from Irvin's blows. Deal points to several comments made by the prosecutor during closing argument, such as "a man may use force to protect himself in his own home" and Irvin "had a right to defend himself from a man who had already physically attacked him" a few weeks prior. The prosecutor also commented that Irvin "may have hit" Deal but that "he was justified in protecting himself." The prosecutor further argued:

> "[Deal] did not have a right to defend himself. [Deal] is the initial aggressor.
>
> "[Deal] went to that house willingly. No one had a gun to his head. No one said, [Deal], you'll drive over to [Irvin's] house or I'll beat the crap out of you. He went on his own. He made that decision. He made the decision to walk up to [Irvin's] house. He made the decision to confront [Irvin]. He made the decision to cross the threshold into [Irvin's] house uninvited and confront [Irvin]. Where I come from I think he got what he deserved."

Although the trial court sustained defense counsel's objection to these remarks, Deal contends the damage had already been done.

Regardless of whether the Court of Appeals overlooked these statements by the prosecutor, this oversight does not change the remainder of the Court of Appeals' analysis regarding the overwhelming evidence against Deal.

We are persuaded in reaching this conclusion by several factors. First, the trial court's action in sustaining the objection to a portion of the prosecutor's argument made it clear that part of the argument was inappropriate. Further, the "no duty to retreat" instruction did not go so far as to instruct the jury that Irvin was not the initial aggressor or even that he could not be the initial aggressor; rather the instruction merely stated that he did not have to retreat if Deal was the aggressor. PIK Crim. 3d 54.17-A (2001 Supp.) ("When on his home ground, a person is not required to retreat *from an aggressor*, but may stand on his ground and use such force

to defend himself as he believes, and a reasonable person would believe, necessary." [Emphasis added.]). Nor did the instruction equate trespassing with aggression. Rather, the determination of who was the initial aggressor—Deal or Irvin—remained with the jury.

In addition, the jury instructions as a whole laid out two paths of analysis for the jury's consideration, and those paths varied depending on whether the jury believed Irvin or Deal was the initial aggressor. See *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009) (appellate court is required to consider the instructions as a whole and not isolate any one instruction in considering if jury could have been misled by instructions). Importantly, even if, as Deal argues, Kansas law did not support giving the "no duty to retreat" instruction under circumstances where the alleged victim, as opposed to the defendant, was standing on home ground, Irvin was justified in the use of reasonable force if Deal was the aggressor. See K.S.A. 21-3211 (Furse 1995) ("A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."). On the other hand, the self-defense instructions advised the jury that if Irvin was the aggressor Deal had the right to defend himself. Hence, the instructions gave the jury the option to determine either Deal or Irvin was the aggressor.

Furthermore, contrary to Deal's argument, there was evidence to support either path. For example, Deal referred to the tire iron as "my bar" during the walk-through interview; this suggested Deal brought the bar into the house and was the initial aggressor. Also, Deal's version of the events was contradicted when officers did not observe the defensive injuries one would expect if Deal had blocked Irvin's blows with the tire iron. (They noticed only one small red mark.)

More critically, however, Deal's argument is defeated by the evidence of the brutal and extensive beating that occurred, a beating far exceeding the force necessary to wrestle the tire iron from Irvin. See K.S.A. 21-3211 (Furse 1995) ("A person is justified in the use of force against an aggressor when and *to the extent it*

*appears to him and he reasonably believes that such conduct is necessary* to defend himself or another against such aggressor's imminent use of unlawful force." [Emphasis added.]). As the Court of Appeals noted, Deal quickly gained control of the only weapon that Irvin was alleged to have used. He did so, according to his statement, by hitting Irvin in the groin. Granted, Deal also stated he hit Irvin one time with the tire iron in self-defense. But he admitted he hit Irvin again out of anger as well. Added to that, the physical evidence is contrary to Deal's position. Dr. Czarnecki testified to broken ribs, arms, and blows to both sides of Irvin's head. Once Irvin was disarmed and disabled, Deal and Montoya continued to beat Irvin to death.

We conclude that even if the giving of the "no duty to retreat" instruction was error, it was not reversible error.

## JOHNSON ISSUE

Deal next argues the trial court violated his Sixth and Fourteenth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it sentenced him to the aggravated sentence in the grid block—168 months—without requiring the aggravating factors to be put before a jury and proved beyond a reasonable doubt.

Deal recognizes this court rejected this same argument in *State v. Johnson*, 286 Kan. 824, 190 P.3d 207 (2008). There, this court held because the Kansas Sentencing Guidelines Act provides the trial court with discretion to impose any sentence within the presumptive range, the prescribed statutory maximum sentence under *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), is the high number in the applicable sentencing grid box. Therefore, a sentence to any term, including an aggravated term, within the range in a presumptive grid box does not violate *Cunningham* or *Apprendi. Johnson*, 286 Kan. at 851. Moreover, because a sentence that falls within the applicable grid box is a presumptive sentence, appellate courts lack jurisdiction to consider a challenge to such sentence under K.S.A. 21-4721(c). Appellate courts lack jurisdiction even if the sentence is to the longest term in the presumptive grid box for a defendant's convictions.

*Johnson*, 286 Kan. at 851-52; see *State v. Houston*, 289 Kan. 252, 278, 213 P.3d 728 (2009) ("While Houston asks us to reconsider *Johnson*, he has not presented any new facts or law that merit reconsideration of this issue. Accordingly, we see no reason to retreat from that position now."). Deal's argument fails.

## IVORY ISSUE

Finally, Deal contends that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution under *Apprendi*, 530 U.S. 466, when it sentenced him to an increased sentence, based upon his criminal history, without requiring that the State prove his criminal history to a jury beyond a reasonable doubt.

Deal concedes that this issue is controlled by our decision in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). And this court has continued to consistently follow *Ivory*. See, *e.g.*, *State v. McCaslin*, 291 Kan. 697, 731, 245 P.3d 1030 (2011). Deal provides no compelling reason to revisit our current holding on the constitutionality of calculating criminal history scores without submitting them to a jury.

Affirmed.

MORITZ, J., not participating.

DAVID L. STUTZMAN, District Judge, assigned.